978 A.2d 651

**QUESTAR BUILDERS, INC.**

v.

**CB FLOORING, LLC.**

No. 153, Sept. Term, 2008.

Court of Appeals of Maryland.

Aug. 25, 2009.

242

Robert T. Shaffer, III (Conor B. O'Croninin of Murphy & Shaffer, LLC, Baltimore), on brief, for appellant.

Catherine A. Bledsoe (R. Michael Smith of Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, Baltimore), on brief, for appellee.

Eric B. Travers, Kegler, Brown, Hill & Ritter, L.P.A., Columbus, OH, brief of American Subcontractors Association, American Subcontractors Association of Baltimore, & The D.C. Metropolitan Subcontractors Association in support of Appellees C.B. Flooring, Inc., amicus curiae.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

Questar Builders, Inc. ("Questar") is a general contractor hired to construct a luxury midrise apartment and townhome complex known as Greenwich Place at Town Center ("Greenwich Place") in Owings Mills, Maryland. After receiving bids from three flooring subcontractors, Questar selected CB Flooring, LLC ("CB Flooring") to install carpeting at Greenwich Place for a total price of $1,120,000. Another bidder, Creative Touch Interiors ("CTI") submitted a proposal to

complete the project for a total price of $1,240,000 [1]; however, Questar rejected that bid in favor of CB Flooring's lower bid.[2] On 29 September 2005, Questar and CB Flooring entered an agreement (the "Subcontract"), pursuant to which CB Flooring agreed to "[f]urnish all labor, materials, equipment and services necessary for and incidental to the execution and completion of all carpet and resilient flooring" for the project's 120 garage townhomes and 212 apartments, as well as its common areas and storage rooms, in exchange for $1,120,000. The Subcontract provided that the agreement was to remain effective "through [ ] DURATION OF THE PROJECT."

The focal point of this litigation concerns Paragraphs 12 and 14 of the Subcontract. Paragraph 12 provided in pertinent part:

> **Breach:** Failure of Subcontractor to perform Work in accordance with each and every term and provision of this Subcontract shall be deemed to be a breach of this Subcontract. In the event of any breach, Contractor may avail itself of any or all of the following remedies: ... (d) to terminate this Subcontract by written notice and take over all or any work tools, equipment, materials and, which shall be effective upon receipt by Subcontractor, supplies of Subcontractor and complete the Work by whatever means Contractor deems appropriate, whereupon Subcontractor shall receive no further payments until the work is completed and shall be fully liable for any costs in excess of the Subcontract sum (Paragraph 2 hereof) [3] resulting from

---

1. Questar maintains in the present litigation that these prices do not reflect accurately the closeness of the bids of CB Flooring and CTI. According to the general contractor, CTI's bid of $1,240,000 included items not reflected in CB Flooring's bid or in the subcontract awarded to CB Flooring. Questar argues that CB Flooring's bid, when adjusted, was actually $3,000 higher than CTI's.

2. The third flooring subcontractor's bid apparently was so low that it left Questar with the impression that the subcontractor misunderstood the scope of the project. That bid is not pertinent to this appeal.

3. Paragraph 2 provided that $1,120,000 was the agreed upon sum payable to CB Flooring for performing under the Subcontract.

Contractor's completing the Work (*if Subcontractor is not in breach then such termination shall be deemed termination for convenience pursuant to Paragraph 14 hereof*)....

(italics added). Paragraph 14 provided:

**Termination for Convenience:** If this Subcontract Agreement is terminated for convenience, Subcontractor shall be entitled, as its sole compensation, to be paid that portion of the total price provided in this Subcontract Agreement that is equal to the reasonable value of the authorized materials, equipment and incidentals furnished and delivered to the job site prior to the termination plus the reasonable value of properly authorized materials fabricated and properly stored ("Stored Materials") by Subcontractor prior to the termination, and of properly authorized special inventory items specifically purchased ("Special Inventory") by the Subcontractor for this project prior to the termination. The Subcontractor shall only be paid for Stored Materials and Special Inventory after the Subcontractor has delivered, at its expense, such Stored Materials and Special Inventory to a location specified by the Contractor and the Contractor has inspected and acknowledged in writing the acceptance of the Stored Materials and Special Inventory.

Three additional provisions of the Subcontract are also relevant to this matter. First, Paragraph 7 provided:

**Changes:** Contractor may, at any time, unilaterally or by agreement with Subcontractor, make changes in the Work. Any change order or agreement shall be in writing. Subcontractor shall perform the Work as changed without delay. Subcontractor shall be entitled to an equitable adjustment pursuant to Paragraph 13 hereof if the change involves an adjustment in the Subcontract sum (Paragraph 2 hereof) or the time of performance (Paragraph 4 hereof) [4].

Second, Paragraph 13 provided, in pertinent part:

---

4. Paragraph 4 provided that time was to be considered of the essence.

### Settlement of Disputes and Claims:

(a) With respect to any dispute between Contractor and Subcontractor or any Claim by Subcontractor, Contractor shall make a good faith, unilateral determination as to the equitable adjustment, if any, to be allowed, and issue a decision which shall be followed by Subcontractor. Subcontractor shall continue to perform the Work without deficiency, interruption or delay, pending such determination. If Subcontractor's claim is allowed by Contractor or by arbitration as provided for in Paragraph 1[6[5]] hereof, Subcontractor shall be entitled to an equitable adjustment in the Subcontract sum (Paragraph 2 hereof) and/or the Subcontract time of performance (Paragraph 4 hereof) as its sole remedy. Notification of any such claim for equitable adjustment must be made in writing with complete supporting data within twenty (20) days of Subcontractor's knowledge of the claim.

Finally, Paragraph 16 expressed the parties' mutual agreement to arbitrate all disputes concerning amounts less than $50,000, as well as Questar's right to elect arbitration for disputes concerning amounts greater than $50,000.

The complicated series of events from which this appellate "magic carpet ride" springs began even before the Subcontract was signed. The architectural drawings that Questar supplied to CB Flooring, upon which CB Flooring based its bid, specified that Shaw Custom ("Shaw") "field" carpet was to be used in the corridors of Greenwich Place. The drawings did not indicate that "border" carpet would be installed in the corridors. Yet, the Subcontract, when drafted by Questar, plainly called for CB Flooring to install border carpet. The CB Flooring salesmen reviewing the draft Subcontract realized the discrepancy and sought to strike-out this proposed requirement; however, he failed to notice that his proposed change was not incorporated in the final draft.

---

5. Paragraph 13 of the Subcontract mistakenly referred to Paragraph 15 as the arbitration clause. The parties agree that this was a mistake.

In its executed form, the Subcontract required CB Flooring to install field and border carpets in the corridors of Greenwich Place and specified that the carpeting would be the same as the carpeting at Russett at Concord Park ("Concord Park"), a similar residential complex developed by Questar. The parties now agree that the corridors of Concord Park were furnished with Shaw field carpet and Bigelow Preview II ("Bigelow") border carpet.

Matters became more complicated after execution of the Subcontract when the interior design firm working on the Greenwich Place project changed the carpets to be installed in the clubhouse and corridors from Shaw and Bigelow carpets to Bentley Prince Street ("Prince Street")[6] field carpet with Bentley New Stratford ("New Stratford") border carpet. In December 2005, the interior designer issued a set of plans, referred to as ID Drawings[7] (the "70% ID Drawings"), specifying Prince Street as the new field carpet. The plans were only 70% complete and did not include any change with respect to the border carpeting; however, approximately one month later, the interior designer issued a complete set of plans (the "100% ID Drawings"), specifying New Stratford as the new border carpet.[8]

Before CB Flooring responded to either set of ID Drawings, however, Questar contacted CTI about installing carpeting at Greenwich Place, assertedly because it was "trying to keep CB Flooring honest" in the event that CB Flooring requested more money on account of the carpeting changes advanced by the interior designer. CTI submitted a new bid to Questar, proposing to install carpeting at Greenwich Place for

---

6. At times during the proceeding in the trial court, Prince Street was referred to as Bentley Custom. We refer to the carpet simply as Prince Street to avoid confusion with Shaw Custom and/or Bentley New Stratford.

7. Apparently, "ID Drawings" is shorthand for Interior Decorator Drawings.

8. The differences are not necessarily in brand names only. Cost issues may arise with the design changes.

$1,119,000; however, CTI's figures were based on the Shaw and Bigelow carpets used at the Concord Park project, not the Prince Street and New Stratford carpets specified by the ID Drawings. On 23 February 2006, CB Flooring, as anticipated, submitted a change order requesting an upward adjustment of $33,566 to the Subcontract price. Four days later, Questar sent an unexecuted subcontract to CTI, pursuant to which CTI would install carpeting at Greenwich Place in exchange for $1,120,000.

On 3 March, CB Flooring, citing a mathematical error, submitted a revised change order to Questar, changing its requested adjustment from $33,566 to $103,371 above the original Subcontract price. Shortly thereafter, Charles Bode, CB Flooring's Vice President, spoke by telephone with Donald Richards, Questar's Vice President and Production Manager, about the requested adjustment. Bode and Richards testified to quite different recollections of what transpired in that conversation. In any event, Bode asked Richards to call him back later in the week so that they could discuss the matter further, but Richards did not do so. Instead, in a letter dated 23 March 2006, Questar's Senior Vice President, Frank Maccherone, notified CB Flooring that Questar was terminating the Subcontract.

In the termination letter, Maccherone stated that the termination was for cause, charging that CB Flooring materially breached the Subcontract by refusing to perform; however, he iterated that, even in the absence of a breach by CB Flooring, Questar nevertheless enjoyed a right to terminate the Subcontract for convenience under Paragraph 14, entitling CB Flooring to no compensation. The letter also accused CB Flooring of acting in bad faith by using the interior designer's changes to seek an unwarranted increase in the Subcontract price.

After terminating its agreement with CB Flooring, Questar entered a subcontract with CTI on 5 April 2006, pursuant to which CTI agreed to install the carpeting at Greenwich Place in exchange for $1,120,000 ($1,000 more than its February 2006 bid price). This subcontract permitted CTI to install

Bigelow border carpeting in the corridors, as opposed to the New Stratford border described by the ID Drawings. Questar apparently did not seek the interior designer's approval before deviating from the interior designer's plans.

Alleging that Questar terminated the Subcontract wrongfully, CB Flooring initiated a breach of contract action against the general contractor in the Circuit Court for Baltimore County in April 2006.[9] Chiefly, CB Flooring contended that, although it requested an upward price adjustment due to the interior designer's change in carpeting, it did not refuse to perform its contractual obligation to install carpeting at Greenwich Place as asserted by Questar in the termination letter. CB Flooring denied that its request for an upward adjustment to the Subcontract price was made in bad faith. Additionally, the subcontractor claimed that the termination for convenience clause, cited by Questar as an alternative basis for terminating the Subcontract, did not apply under the circumstances because Questar acted in bad faith by invoking the clause after scheming to hire CTI in its place. To that end, CB Flooring asserted that Questar created an uneven playing field by allowing CTI to base its February 2006 bid on Shaw and Bigelow carpets, as opposed to the Prince Street and New Stratford carpets described by the ID Drawings. The subcontractor also complained that CTI's subcontract with Questar deviated unfairly from the ID Drawings by permitting CTI to install Bigelow border carpeting, as opposed to New Stratford border carpeting.

Questar countered that Bode informed Richards during their March telephone conversation that CB Flooring would not perform under the Subcontract unless Questar agreed to a price increase. Questar determined that the price increase was not warranted under the circumstances. The general contractor also claimed that CB Flooring failed to attend weekly, on-site progress meetings as required by the Subcontract. Thus, so Questar's defense proceeded, it justifiably

---

9. CB Flooring also sued CTI for tortious interference with contractual relations; however, that claim is not pertinent here.

terminated the Subcontract for cause. Alternatively, Questar postulated that Paragraph 14 of the Subcontract gave it the right to terminate the agreement at its convenience. Questar claimed that this right was unlimited; however, it contended that, even if the court imposed some limitation on the exercise of the right, that limitation was satisfied because Questar lost confidence in CB Flooring's ability to perform its obligations in a satisfactory manner due to the subcontractor's absence from weekly on-site progress meetings and its delay in ordering carpeting.

During the plaintiff's case-in-chief in the Circuit Court, CB Flooring adduced evidence that Shaw quoted a price of $15.89 per square yard, whereas Bentley quoted prices of $17.70 and $21.70 per square yard, respectively, for the Prince Street and New Stratford carpets.[10] Moreover, the subcontractor's Senior Contract Administrator testified that the shipping costs associated with the Prince Street and New Stratford carpets are substantially higher than those associated with Shaw carpeting because the latter is manufactured in Georgia, whereas the former are manufactured in California. She also claimed that Bentley requires an expensive adhesive to install its Prince Street and New Stratford models.

In addition, CB Flooring's Senior Contract Administrator explained that Bigelow carpeting costs $7.29 per square yard. She averred, therefore, that CB Flooring should have lowered the Subcontract price if, like CTI, CB Flooring was permitted to install Bigelow, instead of New Stratford, as the border carpet in the corridors of Greenwich Place. She testified also that the lead times between ordering and delivery for all of the carpets was six weeks or less and, thus, CB Flooring would not have had difficulty performing in time for Questar to meet its Memorial Day deadline for Greenwich Place's Grand Opening.

---

**10.** Fortunately, we need not delve further here into the thicket of conflicting information adduced by the parties concerning carpet prices. The question of whether CB Flooring actually was entitled to a price adjustment is one with which this Court (and the Circuit Court) need not concern itself.

Bode also testified for CB Flooring. He averred that he placed the call to Richards because he was concerned about rumors that Questar propositioned CTI about installing the carpeting at Greenwich Place after execution of the Subcontract; he emphatically maintained that he initiated the call, not Richards, as claimed by Questar. According to Bode's recollection of their conversation, he never refused to perform under the Subcontract; he merely informed Richards that "reasonable men can resolve these differences" and asked Richards to call him later in the week to discuss the matter further, which Richards did not do. Bode also stated that he informed Richards that CB Flooring could, if needed, substantiate its requested price increase.

Furthermore, Bode stated that Richards never conveyed to him during their conversation that Questar was losing confidence in CB Flooring's ability to perform its obligations in a satisfactory manner. Supporting Bode's assertion in that regard, CB Flooring's Field Supervisor testified that he occasionally visited the Greenwich Place site when he was in the area and no one from Questar ever expressed concern with CB Flooring's absence from weekly on-site progress meetings. The Field Supervisor asserted that he and others from CB Flooring ordinarily begin attending progress meetings approximately four weeks before commencing work at a job site.

CB Flooring also adduced testimony from a salesperson with CTI who recalled being contacted by Frank Maccherone of Questar in January 2006 about submitting a new bid for installing carpeting in the Greenwich Place project. She testified that Maccherone instructed her to "revise [her] pricing" from the earlier bid of $1,240,000 that she submitted in summer 2005; however, he authorized her to base the new bid on the Shaw and Bigelow carpets, as opposed to the Prince Street and New Stratford ones contemplated by the recently issued ID Drawings. She also averred that she felt "uncomfortable" when Maccherone later asked her "for a fax stating that the border carpet (Bigelow) is the same quality and price as the Bentley [New Stratford]" because, according to her, the Bigelow was substantially cheaper.

Questar called Frank Maccherone as its first witness in its defense case. When asked about CB Flooring's absence from weekly progress meetings, he testified:

[A]ttendance at these progress meetings is a requirement, particularly when, you know, we have sub[contractor]s that their work is upcoming. We know there's lead times. We know there's demanding scheduling items that need to be discussed, reviewed, to make sure that we're not gonna get hung up on the actual completion and opening of our project.

That was very much on my mind.

. . . .

I think CB [Flooring] was certainly capable of doing the job, but they just weren't indicating to me, to us, that they were focused on this job. I don't know if they were too big, if at that particular time they had other things going on. But we couldn't get their attention to our project, and that was very much of concern to me.

He explained that he became even more concerned when he did not hear from CB Flooring after the subcontractor received the 70% ID Drawings and, therefore, he asked Questar's Senior Superintendent for the Greenwich Place project to contact CB Flooring. According to Maccherone, the Superintendent informed him that CB Flooring anticipated requesting an upward adjustment to the Subcontract price. That news caused him to question whether CB Flooring intended to use the carpeting change as an opportunity to take advantage of Questar.

Moreover, he became even more worried when Questar did not hear from CB Flooring in response to the 100% ID Drawings. He stated that custom commercial field carpets have a 12 to 16 week order-delivery lead time and, thus, he was concerned that Questar would not be able to finish installing the carpeting at Greenwich Place before the complex's scheduled Memorial Day Grand Opening. He averred further that, when CB Flooring finally submitted its change order for an upward adjustment of $103,000, he instructed

Richards to request supporting documentation from the sub-contractor. When CB Flooring did not provide it, Maccherone refused the adjustment. He directed Richards to inform CB Flooring of the refusal, and when Bode indicated to Richards that CB Flooring would not perform, he decided to terminate the Subcontract.

Maccherone also explained how Questar's subcontract with CTI came to permit CTI to install Bigelow border carpeting, as opposed to the New Stratford carpeting contemplated by the ID Drawings. According to him, he informed CTI's salesperson that the subcontract could call for Bigelow carpeting if she could substantiate that the carpets were comparable in price and quality; otherwise, he could not allow the subcontract to vary from the ID Drawings. He averred that the salesperson indicated to him that the quality was the same, but did not provide him with any information on the price. Nevertheless, he permitted the change because he understood the carpets to be of comparable price and the "blended" price that she quoted him for Prince Street and Bigelow carpets was within Questar's budget for the project.

Seeking to justify that CTI's January 2006 proposal was not based on the ID Drawings, Maccherone claimed that he did not ask CTI to base its bid on erroneous specifications; however, he conceded that CTI was not instructed to resubmit a bid based on the ID Drawings. He admitted that he did not receive any independent third-party verification from CTI that the Bigelow border was of comparable quality and price to the New Stratford border. Although the owner of Greenwich Place approved the carpet switch, Maccherone could not recall informing the interior designer that CTI's subcontract re-placed the New Stratford with Bigelow.

CB Flooring's counsel's cross-examination of Maccherone also revealed a dispute over whether the draft subcontract that Questar sent to CTI on 27 February 2006 contained a provision allowing CTI to install the Bigelow border. CB Flooring sought to show that Maccherone's asserted efforts to reconcile the prices and qualities of the New Stratford and

Bigelow carpets were nothing more than a ruse to justify, *post hoc*, Questar's allowing CTI to install the Bigelow. CB Flooring's counsel pointed out to Maccherone that the subcontract with CTI, although signed on April 5, was dated February 27 and contained the clause permitting the Bigelow border. Maccherone responded that Questar prepared the document on February 27, but substantial changes occurred between then and the subcontract's signing by CTI. One change was the substitution of Bigelow carpeting for New Stratford carpeting; however, the parties did not change the date of the document as they made revisions before signing.[11]

In addition, CB Flooring's counsel reminded Maccherone of his earlier testimony that custom carpets generally have lead times of 12 to 14 weeks (which assertedly caused him to worry that CB Flooring would not be able to complete its project in time for Greenwich Place's Memorial Day opening). When questioned further about the project's timing, Maccherone acknowledged that a 12 to 14 week lead time would not have permitted CTI to finish the project in time, considering that CTI signed its subcontract in early April and its salesperson represented that CTI would not order any carpeting until the subcontract was signed.

---

**11.** During cross-examination of Maccherone on this point, Questar's counsel objected to plaintiff's counsel's attempt to characterize the subcontract as arising in February, despite the agreed upon fact that it was signed in April. The Court rendered the following response:

I understand we have a signed copy in April. Believe me, I understand that. My notes indicate on Plaintiff's exhibit 20, subcontract agreement, signed in April.

I'm just saying, I've looked at it. It's dated February 27th, 2006. It was produced by CTI. We understand where it came from. There's no reason to believe that the document wasn't in existence on February 27th no matter how many times the defendants want to say it was signed in April. Got it. Okay?

The trial judge's comments suggest that she found that the provision allowing the Bigelow carpeting existed in the February draft subcontract with CTI; however, she did not mention it during her final ruling from the bench. The issue of whether Questar decided to permit CTI to install the Bigelow carpeting seems significant potentially in determining whether Questar was permitted to terminate the Subcontract for convenience. As we shall explain later, the trial court will get an opportunity to revisit this point on remand.

Richards also testified for Questar as to his recollection of his telephone conversation with Bode. Richards averred that he called Bode, after Maccherone "absolutely" denied CB Flooring's change order. Bode was not in the office at the time, so he left a message for Bode. Bode later returned his call. Richards claimed that he informed Bode of the denial and asked him whether CB Flooring still would perform. He also stated that he informed Bode of Questar's general concerns about what it perceived as CB Flooring's inattentiveness to the project. When asked how Bode responded, Richards explained:

First with regards to the lack of focus, [Bode] realized that he had some internal coordination issues, you know, between the estimating department, their field coordinator, the sales representative, his internal team, recognized that he had some issues and that he would work on that.

Really it didn't give me a comfort level at all that anything was gonna change there, just recognizing that he had some issues there.

And clearly told me that he felt there was a—a warranted dollar change, and it was in the magnitude of $103,000, and that he clearly would not proceed to do the work without a signed change order in that amount of money.

Like Maccherone, Richards also testified that generally there is a 12 to 14 week lead time for custom commercial carpets. He averred that his concern over the lead time, on two occasions, prompted him to place a telephone call to CB Flooring's Field Supervisor and request the Field Supervisor's presence at weekly progress meetings, but that no one from CB Flooring ever attended.

As part of its defense case, Questar also adduced evidence that the there was no price difference between the Shaw and Prince Street carpets and that the combined price of Prince Street and New Stratford was comparable to the combined price of Shaw and Bigelow, contrary to CB Flooring's evidence. Additionally, the general contractor adduced evidence that, before it submitted its initial bid, CB Flooring performed

a site inspection of the carpeting at the Concord Park project, thus putting the subcontractor on notice that border carpeting would be included in the Subcontract.

Finally, it was revealed that CB Flooring's change order included 100% of the costs associated with the Prince Street and New Stratford carpets, but subtracted only 90% of the costs associated with the Shaw carpeting. CB Flooring's Senior Contract Administrator sought to justify the discrepancy by claiming that a 90% credit is standard industry practice where the general contractor changes the materials initially contemplated; however, she acknowledged that the Subcontract did not contain a provision authorizing CB Flooring to add to its change order 10% of the costs of the Shaw carpeting. She also acknowledged that CB Flooring did not explain the 90% credit to Questar.

After closing arguments, the trial judge rendered her ruling orally from the bench. She observed that CB Flooring made a mistake in its summer 2005 bid, which translated to a mistaken belief as to its obligations under the Subcontract. She also recognized the possibility that CB Flooring might not have been entitled to its requested price increase, given the subcontractor's own error and the conflicting evidence adduced by both parties on the pricing of the carpets.

Penultimately, the trial judge found that CB Flooring did not breach the Subcontract.[12] Specifically, she credited Bode's testimony that he did not communicate to Richards that CB Flooring would not perform under the Subcontract. She "d[id] not believe that [Richards] told [ ] Bode in their conversation that the defendant was ordering the subcontractor to proceed as directed by the [Sub]contract." The trial judge recognized that the Subcontract required CB Flooring to attend weekly on-site progress meetings, but concluded that CB Flooring's absence from those meetings did not constitute a material breach of the Subcontract. She noted that the

---

12. Questar does not challenge here the trial court's ruling that CB Flooring was not in breach.

subcontractor's Field Supervisor occasionally visited the Greenwich Place site and no one from Questar complained to him about the subcontractor's absence from the meetings. She rejected Questar's assertion that it directed CB Flooring representatives to attend the meetings. The trial judge also found that CB Flooring did not attempt to use the change order as leverage and did not jeopardize the timely performance of the Subcontract.

With respect to Questar's alternative defense that Paragraph 14 conveyed a right to terminate the Subcontract for convenience, the trial judge rejected Questar's contention that it enjoyed a right to terminate the Subcontract for any reason. She considered and rejected Questar's assertion that its subjective loss of faith in CB Flooring's ability to perform satisfactorily (or for the agreed upon price) satisfied whatever implied limitations there might be on the exercise of the termination for convenience clause, noting that Questar's "gut feeling" was not sufficient.[13] She credited the testimony of CB Flooring's Senior Contract Administrator, who explained that the lead times for all of the custom carpets was six weeks or less. She also credited the testimony of CTI's salesperson, noting that the salesperson felt "uncomfortable" when Maccherone asked for confirmation that New Stratford and Bigelow carpets were of comparable price and quality.

The trial judge rejected much of the testimonies of Maccherone and Richards. Specifically, she observed:

> I don't think [Richards] made any effort to contact the plaintiff regarding any unhappiness about anything, including not having received a proposed change order sooner. I don't think that he communicated that he had lost confidence in the plaintiff in any way. I'm not even sure he had lost confidence in the plaintiff before perhaps being advised by Mr. Maccherone that that's what his attitude should be.
> . . . .

---

**13.** Although the trial judge found that the Subcontract's termination for convenience clause did not apply under the circumstances, she did not render a conclusion of law as to when such a clause would apply.

It did not seem that Mr. Richards had communicated to the plaintiff that he was ordering them to proceed or that the defendant was contemplating terminating the contract or that he was demanding proof of what the plaintiff claimed was necessary in the change order.

. . . .

And although [Questar's counsel] has suggested that Mr. Maccherone was not scheming when he submitted the interior design drawings to CTI, it appears to the court otherwise.

The suggestion that there was nothing sinister or unusual about Mr. Maccherone's communications with [CTI's salesperson] in January and February is rejected. There was— it was I think very unusual for a general contractor to behave as Mr. Maccherone did in this case.

It was out of the ordinary to send the interior design drawings to a competitor of the subcontractor who had a written and signed contract with the general [contractor] and had never indicated any reluctance to perform that contract as agreed.

If the defendant thought that it was commercially unreasonable or had been an inordinately long time to respond with proposed change orders, that period in late January and February, I can't understand why the defendant never communicated that.

Accordingly, the trial judge concluded that Questar improperly terminated the Subcontract and awarded more than $243,000 in expectation damages to CB Flooring.[14] Following the resolution of a series of post-judgment motions not pertinent here, Questar noted a timely appeal to the Court of Special Appeals. In its brief in that court, Questar presented the following questions:

---

**14.** Questar does not challenge here the amount of damages awarded to CB Flooring.

1. Whether a "termination for convenience" clause contained in a contract between private parties is enforceable under Maryland Law[?]

2. Whether the trial court erred by holding, as a matter of law, that the parties' "termination for convenience" clause was inapplicable and did not allow Questar to terminate the parties' Subcontract without cause[?]

Before argument in the intermediate appellate court, this Court, on its initiative, issued a writ of certiorari. *Questar Builders, Inc. v. CB Flooring LLC*, 406 Md. 744, 962 A.2d 370 (2008). For the reasons that follow, we hold that the "termination for convenience" clause in this case may be enforceable, subject to an implied obligation to exercise the right to terminate in good faith and in accordance with fair dealing. We also hold that, on the present record, it is not clear that the clause was inapplicable under the circumstances found by the trial court. Accordingly, we vacate the Circuit Court's judgment and remand the case to the Circuit Court to resolve the remaining, potentially relevant discrepancies in the parties' accounts of the events leading up to the termination of the Subcontract and to enter a judgment that is consistent with this Opinion.[15]

## Standard of Review

Under Maryland Rule 8–131(c),

When and action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

" 'The deference shown to the trial court's factual findings under the clearly erroneous standard does not, of course, apply to legal conclusions.' " *Karsenty v. Schoukroun,*

---

15. Our vacation of the lower court's judgment is not an invitation for Questar to re-litigate the issue of whether CB Flooring breached the Subcontract. The trial court found that the subcontractor was not in breach, and Questar has not challenged that finding.

406 Md. 469, 502, 959 A.2d 1147, 1166 (2008) (quoting *Griffin v. Bierman*, 403 Md. 186, 195, 941 A.2d 475, 480 (2008)). We review the lower court's legal conclusions for legal error under a non-differential standard. *Nesbit v. Gov't Employees Ins. Co.*, 382 Md. 65, 72, 854 A.2d 879, 883 (2004). "The interpretation of a contract ... is a question of law." *Sy–Lene of Wash., Inc. v. Starwood Urban Retail II, L.L.C.*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003).

## Analysis

### I.

Courts and commentators generally agree that the concept referred to here as contract "termination for convenience" developed during (and in the years following) the American Civil War as a tool for the U.S. government to avoid costly military procurements that were rendered unnecessary by changing war-time technology or by the cessation of conflict. *Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1540 (Fed.Cir.1996); *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756, 763–64 (1982); JOHN CIBNIC, JR. ET AL, ADMINISTRATION OF GOVERNMENT CONTRACTS 1049 (4th ed. 2006); Maj. Bruce D. Page, Jr., *When Reliance is Detrimental: Economic, Moral, and Policy Arguments for Expectation Damages in Contracts Terminated for the Convenience of the Government*, 61 A.F.L.REV. 1, 2 (2008). For example, because commanders did not know how long their men would be stationed in a particular area, in 1863 the U.S. Army promulgated a rule requiring that all of its contracts with subsistence stores include a provision allowing the Commissary–General to terminate the contract at his discretion. *See generally United States v. Speed*, 75 U.S. (8 Wall.) 77, 82, 7 Ct.Cl. 93, 19 L.Ed. 449 (1868) (describing such contracts).

In *United States v. Corliss Steam–Engine Co.*, 91 U.S. 321, 23 L.Ed. 397 (1874), a case often cited as the legal cornerstone of the federal government's right to terminate a contract for convenience,[16] the Secretary of the Navy terminated the

---

16. *See Torncello*, 681 F.2d at 764 (noting that *Corliss* "is credited as providing the basic legal theory to support the modern termination for

Navy's contract with a ship builder, asserting that the Navy no longer needed the requested ships due to the end of the Civil War. Corliss, the ship builder, had not performed the extent of its contractual obligations; nor had it been paid in full by the government. Nevertheless, Corliss proposed settlement terms for the work it completed up to the point of termination, and the Secretary accepted the terms. Corliss rethought its decision, deciding that settling with the Secretary was imprudent, and sued the government, claiming that the settlement agreement was invalid and seeking the full value of the contract. *Corliss*, 91 U.S. at 322. In affirming the Court of Claims's decree denying Corliss's claim, the Supreme Court reasoned that the cessation of the war rendered the contract "unnecessary," and, thus, "under the circumstances," the Secretary lawfully settled with Corliss for less than the full value of the contract. *Id.* at 323. The Court, going beyond its core holding, emphasized the need for the government to have broad discretion with respect to terminating its war-time contracts:

> Contracts for the armament and equipment of vessels of war may, and generally do, require numerous modifications in the progress of the work, where that work requires years for its completion. With improvements constantly made in shipbuilding and steam-machinery and in arms, some parts originally contracted for may have to be abandoned, and other parts substituted; and it would be of serious detriment to the public service if the power of the head of the Navy Department did not extend to providing for all such possible contingencies by modification or suspension of the contracts, and settlement with the contractors.

*Id.* at 323.

Justified by *Corliss*, the federal government expanded its reliance on broad powers to terminate many of its contracts

---

convenience clause"); Charles Tiefer, *Forfeiture by Cancellation or Termination*, 54 Mercer L.Rev 1031, 1052 (2003) (noting that the "[t]he federal government's termination of contracts for convenience doctrine dates back to" *Corliss* ).

during and after World War I. *See Krygoski Constr. Co.,* 94 F.3d at 1541 (noting that "[a]fter World War I, the government terminated contracts in large numbers"); *Torncello,* 681 F.2d at 764 (noting that "[d]uring World War I, the *Corliss* doctrine expanded into a very important part of military procurement"). In 1917, Congress passed the Urgent Deficiency Appropriation Act, authorizing the President "to modify, suspend, cancel, or requisition any existing or future contract for the building, production, or purchase of ships or material" ordered for the war effort. Pub.L. No. 65–23, 40 Stat. 182. The act directed the President to provide "just compensation" to companies whose war-time contracts were cancelled. *Id.* Assessing what constituted just compensation under the act, the Supreme Court held, in *Russell Motor Car Co. v. United States,* 261 U.S. 514, 523, 43 S.Ct. 428, 67 L.Ed. 778 (1923), that "[a] court must consider the value of the contract at the time of its cancellation, not what it would have produced by way of profits . . . if it had been fully performed." In what would become the basis for denying expectation damages to companies whose contracts were terminated pursuant to modern termination for convenience clauses, the Court observed that, because Russell Motor Car presumably knew that its contract could be terminated pursuant to statute, the "possible loss of profits, therefore, must be regarded as within the contemplation of the parties." *Russell Motor Car Co.* 261 U.S. at 523, 43 S.Ct. 428; *see also* Page, *When Reliance is Detrimental,* at 6 (referring to the Court's comment regarding the parties' contemplation of the possibility of lost profits as "what would prove to be a recurring theme").

Although most terminations of government contracts following the Armistice of 1918 were pursuant to statutes such as the Urgent Deficiency Appropriations Act, some agencies terminated their unneeded contracts under broadly worded, express contractual provisions. *See* Page, *When Reliance is Detrimental,* at 6. For instance, in *Davis Sewing Machine Co. v. United States,* 60 Ct.Cl. 201 (Ct.Cl.1925), the War Department ordered 75,000 pistols from a manufacturer in July 1918.

The Department inserted a provision in the contract that provided:

> *Termination.*—This contract being necessitated by a state of war now existing, it is desirable and expedient that provision be made for its cancellation upon fair and equitable terms in the event of the termination or limitation of the war, or if in anticipation thereof or because changes in methods of warfare the Chief of Ordnance should be of the opinion that the completion of this contract has become unnecessary. It is therefore provided that any time, and from time to time, during the currency of this contract, the Chief of Ordnance may for any of the causes above stated notify the contractor that any part or parts of the articles then remaining undelivered shall not be manufactured or delivered.

60 Ct.Cl. at 203. Applying the rationale of *Russell Motor Car Co.*, the Court of Claims resolved that the manufacturer could not recover expectation damages from the contract's termination because the contract's terms contemplated the possibility of lost profits. *Id.* at 216–17.

The winding-down of procurements after World War I also engendered the corollary concept of constructive termination for convenience. In *College Point Boat Corp. v. United States*, 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925), the Supreme Court held that a manufacturer of collision mats ordered by the U.S. Navy could not recover lost profits arising from the Navy's instructing the manufacturer to cease production. The Navy did not assert its right to terminate the contract under Urgent Deficiency Appropriations Act until the manufacturer sued the Navy for breach of contract. *College Point Boat Corp.*, 267 U.S. at 15–16, 45 S.Ct. 199. Nevertheless, the Court reasoned that the Navy could use its unconditional right to terminate the contract to excuse its failure to perform. *Id.*

The "direct predecessor of the modern termination for convenience clause" developed during the military build-up to World War II. *Torncello*, 681 F.2d at 765. Mandatory in all

fixed-price supply contracts, the clause provided, in pertinent part:

> *Termination for the convenience of the Government.* (a) The Government may, at any time, terminate this contract, in whole or in part by a notice in writing from the Contracting Officer to the Contractor that the contract is terminated under this Article.

*Id.* (quoting 10 C.F.R. § 81.324 (Cum. Supp. 1938–43)). While this clause introduced the word "convenience," the consensus remained that the government's right to terminate a contract was justified by the exigencies and uncertainties of armed conflict. *See G.L. Christian & Assocs. v. United States,* 160 Ct.Cl. 1, 15, 312 F.2d 418 (1963) (noting that "[r]egularly since World War I, it has been a major government principle, in times of stress or increased military procurement, to provide for the cancellation of defense contracts when they are no longer needed"); *Torncello,* 681 F.2d at 765 (noting that wartime contractors during World War II "risked losing the benefits of full performance but only for the exigencies of war").

During the 1960s, however, the federal government's use of similar termination for convenience clauses expanded beyond contracts needed to wage large-scale military operations; such provisions gained widespread use in civilian and peace-time military contracts. *Torncello,* 681 F.2d at 765. Indeed, by 1967, the Federal Procurement Regulation made termination for convenience clauses mandatory in most fixed price supply contracts and construction contracts. *See* CIBNIC, ADMINISTRATION OF GOVERNMENT CONTRACTS, at 1050. At present, the federal government includes these clauses in a myriad of supply, construction, and research and development contracts. *See* 48 C.F.R. § 49.502 (2009). In its modern form, the clause ordinarily provides that the government may terminate "if the Contracting Officer determines that a termination is in the Government's interest." [17] *See Krygoski Constr. Co.,* 94 F.3d

---

**17.** The State of Maryland also includes a termination for convenience clause in many of its contracts. *See, e.g.,* COMAR 21.05.07.06G(8)

at 1544; *Custom Printing Co. v. United States,* 51 Fed.Cl. 729, 733 (Fed.Cl.2002); *see also* 48 C.F.R. 52.249–1 to –5 (2009); *accord* 48 C.F.R. 52.212(*l* ) (2009) (providing for clause in contracts for "commercial items" that allows government to terminate "for its sole convenience").

As noted by Professor Cibnic, the result of the federal government's expanded use of termination for convenience clauses is "that broad rights developed for war contracts have come to be applied to all types of contracts, civilian as well as military, in times of both peace and war." CIBNIC, ADMINISTRATION OF GOVERNMENT CONTRACTS, at 1050. Yet, as a general rule, contracts involving the U.S. government are interpreted (at least in theory) like any contract between private parties. *See Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals."); *Ford Motor Co. v. United States,* 378 F.3d 1314, 1320 (Fed.Cir.2004) ("In case in which the United States is a party to a contract, we apply general rules of contract construction."); *United States v. Bankers Ins. Co.,* 245 F.3d 315, 321 (4th Cir.2001) ("It is well settled that, when the United States is a party to a contract, ordinary principles governing contracts and their interpretation remain applicable."). Accordingly, federal courts have had difficulty reconciling contract provisions allowing the federal government to terminate at its convenience (in circumstances more mundane than the exigencies of war) with the common law rule that a valid contract must be supported by consideration and may not be illusory. *See, e.g., Krygoski Constr. Co.,* 94 F.3d at 1541; *Torncello,* 681 F.2d 756. Balancing these two concepts,

---

(allowing a small procurement contract to include a termination for convenience clause and suggesting that the clause permits the State to terminate the contract "without showing cause"); COMAR 21.07.02.09 (making mandatory in any construction contract a provision entitled "Termination for Convenience of the State," which, in pertinent part, permits termination if "the procurement officer shall determine that such termination is in the best interest of the State").

federal courts, therefore, sought to protect the government's right to terminate a contract for convenience by implying limitations on its use. By our reckoning, there are two competing analytical frameworks that evolved to limit the government's right so as not to render a contract illusory.

The first standard is the "changed circumstances" test articulated by a plurality of the U.S. Court of Claims in *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756 (1982). In *Torncello,* the Navy entered a requirements contract [18] with a company, pursuant to which the company agreed to handle insect and rodent control at six Navy housing projects in the San Diego area. 681 F.2d at 757–58. As with the Subcontract at issue in the case before us, the termination for convenience clause in *Torncello* effectively allowed the Navy to control whether the pest control company ever performed under the contract. As it turned out, the Navy's pest control needs were less than anticipated, and, thus, instead of using the company's services, the Navy relied on the Department of Navy Public Works, which could do the limited amount of work for less cost. *Id.* at 758. The company eventually filed against the Navy a claim for breach of contract. *Id.* The Armed Services Board of Contract Appeals conceded that the Navy breached the requirements contract by not relying on the company for its pest control needs; however, the Board noted that the Navy constructively could terminate the contract for convenience and, because the company did not perform any services thereunder, the company was not entitled to any compensation. *Id.*

Sitting en banc, the Court of Claims reversed the Board. The plurality opinion started from the premise that an interpretation that renders a contract enforceable is preferable to one that renders it illusory. *Id.* at 761. The plurality then reasoned that accepting the government's asserted right to terminate a contract in order to exculpate itself from liability

---

18. A requirements contract is "[a] contract in which a buyer promises to buy and a seller to supply all the goods or services that a buyer needs during a specified period." BLACK'S LAW DICTIONARY 372 (9th ed. 2009).

for breach would render the contract illusory. Relying on the origins of the government's right to terminate a contract for convenience, the plurality concluded that some change in circumstances must occur before the government may exercise that right and, thus, the government may not rely on the provision simply for exculpation. *Id.* at 771. The plurality also rejected the notion that the duty to act in good faith imposed a meaningful limitation on the government, sufficient to prohibit the contract at issue from being illusory. *Id.* at 770. In so doing, the court observed that it is nearly impossible to prove that the federal government did not act in accordance with the duty of good faith and fair dealing. *Id.*

The second analytical paradigm is the "bad faith/abuse of discretion" test. Under this test, "[w]hen tainted by bad faith or abuse of discretion, a termination for convenience causes a contract breach." *Krygoski Constr. Co.,* 94 F.3d at 1541. This test predates *Torncello's* "changed circumstances" test; however, since *Torncello,* the federal courts, for the most part, have returned to reviewing convenience terminations only for "bad faith/abuse of discretion." [19] *See T & M Distribs., Inc. v. United States,* 185 F.3d 1279, 1284 n. 4 (Fed.Cir.1999); *Krygoski Constr. Co.,* 94 F.3d at 1544; *Custom Printing Co.,* 51 Fed.Cl. at 734. The deference accorded the government under the "bad faith/abuse of discretion" standard peaked in *Colonial Metals Co. v. United States,* 204 Ct.Cl. 320, 494 F.2d 1355 (1974).[20] There, the court held that the Navy did not act in bad faith when it terminated its contract with a copper

---

**19.** Since *Torncello,* the caution noted by the plurality that the "bad faith/abuse of discretion" standard is inadequate (because of the nearly insurmountable presumption that federal officials act in good faith) has not gained acceptance. *See Krygoski Constr. Co.,* 94 F.3d at 1544 (noting that the U.S. Court of Appeals for the Federal Circuit has rejected the reasoning of the *Torncello* plurality).

**20.** *Colonial Metals Co.* has been referred to as the "high-water mark" for the government's right to terminate contracts for its convenience. *See Linan–Faye Constr. Co. v. Housing Auth. of Camden,* 49 F.3d 915, 924 (3d Cir.1995); Frederick W. Claybrook, Jr., *Good Faith in the Termination and Formation of Federal Contracts,* 56 Md. L.Rev. 555, 563–64 (1997).

supplier in order to obtain a better price elsewhere, even though the contracting officer knew of the better price at the time the parties entered the contract. *Colonial Metals Co.*, 494 F.2d at 1357. Noting that a termination for convenience clause is "not designed to perpetuate error, but to permit its rectification," the court concluded that bad faith or abuse of discretion would not lie unless a plaintiff proves "malice or conspiracy against the plaintiff." *Id.* at 1361.

■ More recent decisions, however, declare that *Colonial Metals Co.* was decided wrongly, recognizing that the government cannot terminate a contract for convenience simply to get a "better bargain from another source," thus adding some teeth to the "bad faith/abuse of discretion" standard. *See Krygoski*, 94 F.3d at 1541. Nevertheless, in a breach of contract action against the federal government, the party challenging the government's exercise of its right to terminate for convenience must show " 'well-nigh irrefragable proof' that the Government acted in bad faith," in light of the strong presumption recognized in the federal cases that the government acts in good faith. *Custom Printing Co.*, 51 Fed.Cl. at 734 (citations omitted); *see also Krygoski Constr. Co.*, 94 F.3d at 1541.

As the present case evidences, termination for convenience clauses are included sometimes in contracts between private parties. Such clauses are popular in construction contracts. *See* David A. Senter, *Role of the Subcontractor*, *in* FUNDAMENTALS OF CONSTRUCTION LAW 133 (Carina Y. Enhada, et al. eds., American Bar Association 2001). They also are found frequently in contracts "in the high-tech industry, where [they have] been used to reduce the risk of rapidly changing markets." Hugh Alexander & James R. Walsh, *At Your Convenience Courts Are Generally Enforcing Termination For Convenience Clauses in the Private Sector that Are Well Drafted and Prudently Invoked*, 21 LOS ANGELES LAWYER 42, 44 (1998). While the history of the clause's development in the context of federal procurement is helpful to our consideration of the present case in that it illuminates the clause's purpose as a

risk-allocating tool, the case-law supporting such a broad right in federal contracts obviously is of limited value when interpreting a contract between private parties. Simply stated, for political reasons, the federal government stands in a position entirely uncomparable to that of a private person. Highlighting this difference, the Court of Claims observed:

> "[T]he Defense Department and the Congress would be loath to sanction a large contract which did not provide for power to terminate and at the same time proscribe anticipated profits if termination did occur.... [I]t [is] necessary to take account of a possible termination in advance of completion, *and to guard against a common law measure of recovery* which had been disallowed for so many years in military procurement."

*G.L. Christian & Assocs.*, 160 Ct.Cl. at 30, 312 F.2d at 426–27 (italics added).

We are also persuaded by the commentary of Professor Hadfield, who noted:

> [Federal Acquisition R]egulations ... require that every acquisition include a "termination for convenience" clause, the required language of which is specified in the regulations as well. Under these clauses (which vary slightly depending on the nature of the contract) the government reserves the right to terminate the contract when it is in the government's interest to do so and to pay compensation equal to the cost of goods or services provided.... *From the perspective of the common law, this is a limitation to a reliance remedy and a denial of the standard recovery of expectation damages.*
>
> *The judiciary bulks at this deviation from the private law of contracts, despite the fact that it is a clear incident of sovereign immunity and the commitment of the issues of remedies for claims against the government to the legislature.*
>
> . . .
>
> *While [termination for convenience] is an extraordinary result for private contracts, it should not seem so extraordi-*

*nary in the government setting in which the government provisionally submits to the law of contract as an incident of sovereignty.* According to the legislated form of compensation for termination, the contractor in Torncello had not been harmed; in contracting with the government subject to the terms of the Federal Acquisition Regulations, it had not acquired any rights beyond the right to compensation for services actually provided under the contract.

Gillian Hadfield, *Of Sovereignty and Contract: Damages for Breach of Contract by Government,* 8 S. CAL. INTERDIS. L.J. 467, 492–93 (1999) (italics added and footnotes omitted).[21]

Accordingly, we decline to recognize for private parties the near *carte-blanche* power to terminate that courts have given the federal government under convenience termination clauses.[22] Instead, we shall interpret and apply Paragraphs 12 and 14 of the Subcontract according to the common law of contract as interpreted by this Court, which does not require "well-nigh irrefragable proof" of wrongdoing to establish bad faith.

Under Maryland law of contract, illusory contracts are unenforceable. *Cheek v. United Healthcare of the Mid–Atlantic, Inc.,* 378 Md. 139, 148, 835 A.2d 656, 662 (2003). "An 'illusory promise' appears to be a promise, but it does not actually bind or obligate the promisor to do anything. An illusory promise is composed of 'words in a promissory form

---

21. In his law review article, Major Bruce Page, Jr. also provides, as a possible basis for the government's right to terminate for convenience, that otherwise "one government could, in its contracting role, bind a successor government's ability to exercise its ability to exercise its role as sovereign lawmaker." Page, *When Reliance Is Detrimental,* at 37.

22. Nothing in this Opinion should be construed as commentary on how we would interpret a termination for convenience clause in a contract involving the State of Maryland. We note in passing, however, that at least one state supreme court has applied the "changed circumstances" test from *Torncello* in the state government context. *See RAM Eng'g & Constr. Inc. v. Univ. of Louisville,* 127 S.W.3d 579, 584 (Ky.2003). In addition, at least one court has applied the "bad faith/abuse of discretion" test to a municipal government's exercise of its right to terminate for convenience. *See Linan–Faye Constr. Co. v. Housing Auth. of Camden,* 49 F.3d 915, 925 (3d Cir.1995).

that promise nothing.' " *Id.* (quoting CORBIN ON CONTRACTS § 5.28 (2003)). A promise, therefore, is illusory if " 'the promisor retains an unlimited right to decide later the nature or extent of his performance.' " *Id.* (quoting 1 WILLISTON, CONTRACTS, § 4:24 (4th ed. 1990)). An unlimited right to determine how to perform, or whether to perform at all, negates the promise to perform. *Id.*

■ This notwithstanding, courts generally "prefer a construction [of a contract] which will make the contract effective rather than one which will make it illusory or unenforceable." *Kelley Constr. Co. v. Wash. Suburban Sanitary Comm'n,* 247 Md. 241, 247, 230 A.2d 672, 676 (1967). To that end,

> If there is a restriction, express or implied, on the promisor's ability to perform, the promise is not illusory. The tendency of the law is to avoid the finding that no contract arose due to an illusory promise when it appears that the parties intended a contract. Through the process of interpretation, in the absence of express restrictions, courts find implied promises to prevent a party's promise from being performable merely at the whim of the promisor. . . . The nature of the promise to be implied will vary with the kind of transaction and the particular context surrounding the individual transaction.

2 CORBIN ON CONTRACTS § 5:28 (1995).

■ Furthermore, Maryland contract law generally implies an obligation to act in good faith and deal fairly with the other party or parties to a contract. *Clancy v. King,* 405 Md. 541, 565, 954 A.2d 1092, 1106 (2008). That implied obligation governs the manner in which a party may exercise the discretion accorded to it by the terms of the agreement. *Julian v. Christopher,* 320 Md. 1, 9, 575 A.2d 735, 739 (1990). Thus, a party with discretion is limited to exercising that discretion in good faith and in accordance with fair dealing. *Clancy,* 405 Md. at 569, 954 A.2d at 1108; *Julian,* 320 Md. at 9, 575 A.2d at 739.

In this case, the Subcontract did not have a true termination for convenience "clause." The right to terminate for conven-

ience, however, may be extrapolated by reading together Paragraphs 12 and 14. To that end, Paragraph 12 detailed Questar's rights in the event of a breach of the Subcontract by CB Flooring. Among other things, Paragraph 12 allowed Questar to terminate the Subcontract; however the paragraph also provided that, if Questar terminated the Subcontract, but CB Flooring was not in breach, the termination should "be deemed termination for convenience pursuant to Paragraph 14," which limited CB Flooring's compensation to the reasonable value of materials and incidentals already provided (and, as happened here, disallowed recovery entirely if performance did not commence). Thus, a fair reading of Paragraphs 12 and 14 makes clear that Questar was permitted to terminate the Subcontract, absent a default by CB Flooring.

■ Yet, Questar's contention that it was entitled to terminate the Subcontract for any reason whatsoever goes too far and is inconsistent with the terms of the Subcontract. To be sure, a right to terminate in the absence of the other party's breach does not equate necessarily with the right to terminate based on a whim. We shall not read into the Subcontract such unfettered power, where the instrument itself provided that the agreement was to "remain effective through [the] DURATION OF THE PROJECT." *Cf. Towson Univ. v. Conte,* 384 Md. 68, 80, 862 A.2d 941, 947 (2004) (noting that "by specifying the length or term of employment," an employment agreement is not "at will"). In that regard, we presume that the parties meant what their contract expressed. *Nat'l Union Fire Ins. Co. v. David A. Bramble, Inc.,* 388 Md. 195, 208, 879 A.2d 101, 109 (2005). Moreover, if the Subcontract was terminable at will, the express term specifying the agreement's duration would be meaningless because the duration of an "at will" arrangement is, by definition, indefinite. *See DIRECTV, Inc. v. Mattingly,* 376 Md. 302, 320, 829 A.2d 626, 637 (2003) (reiterating cardinal principle of contract interpretation that courts will not disregard provisions of a contract unless there is no other sound way to interpret the contract); *see also* STEVEN J. BURTON & ERIC G. ANDERSON, CONTRACTUAL GOOD FAITH: FORMATION, PERFORMANCE, BREACH, ENFORCEMENT

§ 7.3.2.1 (Little, Brown & Co. 1995) (noting that a clause permitting termination "at will" is a "mechanism for ending an agreement of indefinite duration"). Therefore, we decline to accept Questar's invitation to declare that the right to terminate for convenience here was a right to terminate the Subcontract for any reason whatsoever, including a bad reason or no reason. Furthermore, the history of convenience termination clauses as a risk-allocating tool suggests that Questar's right was not exercisable arbitrarily.

■■■ Thus, where the right to terminate established by Paragraphs 12 and 14 left off, the implied obligation of good faith and fair dealing picks-up, thereby limiting the manner in which Questar was permitted to exercise its discretion. We agree with Corbin on Contracts, which provides further clarification on contract provisions that vest one party with broad discretion to determine whether and to what extent it will perform under the contract:

> Looked at woodenly, it might appear that performance is dependant upon the party's own whim, but courts are not mindless wooden sticks. Judges are cognizant of the utility of such contracts and of the understanding of reasonable parties to such contracts. It is well understood that the party whose duty is subject to [ ] a condition will use reasonable efforts to help bring about the condition to its own liability. Since this is the reasonable understanding, it is an implicit term of the contract. Similarly, even if there is not an implied obligation to use reasonable efforts, an implied obligation to determine whether such a condition exists in good faith, supplies the consideration.

2 CORBIN ON CONTRACTS § 6.14.

This Court's opinion in *Stamatiades v. Merit Music Service, Inc.*, 210 Md. 597, 124 A.2d 829 (1956), is illustrative. There, Stamatiades, a restaurant owner, entered a contract with Music Services, pursuant to which Music Service agreed to install and operate "coin-operated amusement devices" in the restaurant and Stamatiades agreed not to enter a similar arrangement with any of Music Service's competitors during

the contract's duration. *Stamatiades*, 210 Md. at 602, 124 A.2d at 831. In pertinent part, the contract provided:

c. Should there be any necessity in the sole discretion of [Music Service] for the equipment to be replaced or for the number of machines to be decreased, [Stamatiades] agrees to permit [Music Service] to change or decrease the number of machines, but at no time shall [Music Service] increase the number or machines without [Stamatiades's] consent.

*Id.* at 602–03, 124 A.2d at 832. When Stamatiades disconnected Music Service's machines and had another company install similar machines in the restaurant, Music Service sued to enforce the contract. *Id.* at 603, 124 A.2d at 832.

In affirming the order of the Circuit Court for Baltimore City enjoining Stamatiades from contracting with Music Service's competitor, we rejected Stamatiades's assertion that the contract with Music Service was illusory. We observed:

The agreement in the instant case permits Music Service, in case of any necessity, in its sole discretion, to change or reduce the number of machines. This does not mean that Music Service can evade its obligations to furnish machines and to maintain them in satisfactory operating condition simply by declaring a "necessity" which does not exist.

. . . .

The contract speaks of "necessity" for making a change in machines or for reducing their number. This does not mean that Music Service would be at liberty to withdraw any or all of its machines as a matter of its mere wish or caprice, and it is, therefore, not the equivalent of a contract cancellable at will. . . .

*Id.* at 614–15, 124 A.2d at 838.

While the instant case concerns termination for convenience, not necessity, the right to terminate here similarly was not exercisable at the "mere wish or caprice" of Questar. *See id.* at 615, 124 A.2d at 838. As stated, our understanding of the right to terminate a contract for convenience is that it is a risk-allocating tool. Thus, Questar was permitted to terminate only if, in its discretion, it determined that continuing

with the Subcontract would subject it potentially to a meaningful financial loss or some other difficulty in completing the project successfully. Questar's right to terminate the Subcontract for convenience, however, did not permit it to evade either its obligation to make a good faith (albeit unilateral) determination as to whether CB Flooring was entitled to an equitable adjustment to the Subcontract price under Paragraph 13(a) or its obligation to arbitrate disputes with CB Flooring under Paragraph 16. Likewise, Questar was required to act reasonably in ensuring that the Subcontract did not become inconvenient, and it certainly was not permitted to create an inconvenience in order to terminate the Subcontract.

Questar relies on *Niagara Mohawk Power Corp. v. Graver Tank & Manufacturing Co.*, 470 F.Supp. 1308 (N.D.N.Y.1979), for the proposition that a termination for convenience clause amounts to a right to terminate for any or no reason. To refute the obvious challenge that a right to terminate for any reason would render the Subcontract illusory (a disfavored interpretation in Maryland contract law), Questar maintains that other consideration was provided under the Subcontract, thereby rendering the Subcontract enforceable. We reject both premises asserted by the general contractor, addressing them in turn. First, *Niagara Mohawk Power Corp.* is distinguishable because it did not involve contract provisions like Paragraphs 12 and 14. Instead, although the district court characterized the clause at issue there as a "termination for convenience clause," the clause expressly authorized the terminating party to exercise its right to terminate "at any time for any reason." *Niagara Mohawk Power Corp.*, 470 F.Supp. at 1313. But here, as observed, a fair reading of Paragraphs 12 and 14 establishes that Questar enjoyed the right to terminate in the absence of breach by CB Flooring, a far cry from authorizing the general contractor to terminate the Subcontract for any reason whatsoever.

Questar's second point is that other consideration supported its assertedly unfettered right to terminate the Subcontract. As this Court explicated, "an unlimited option to

cancel does not invalidate a contract where it [otherwise] can be shown that it does not wholly defeat consideration." *Stamatiades,* 210 Md. at 613, 124 A.2d at 837. "[S]uch a power to terminate does not invalidate the contract . . ., so long as the party reserving the power to terminate is irrevocably bound for any appreciable time or has materially changed any of his relations or otherwise rendered some performance capable of operating as a consideration." *Acme Markets, Inc. v. Dawson Enters., Inc.,* 253 Md. 76, 87, 251 A.2d 839, 846 (1969); *see also Foster–Porter Enters., Inc. v. De Mare,* 198 Md. 20, 31, 81 A.2d 325, 331 (1951) (noting that a contract terminable at will upon 30 days written notice is "a contract terminable not wholly at will, but only upon 30 days written notice, which is a contract for at least 30 days").

Questar maintains that it was bound irrevocably by the Subcontract in at least one way—it was required to pay CB Flooring the reasonable value of CB Flooring's partial performance, if any, under Paragraph 14. This argument, however, shall not prevail. Because there was no appreciable period of time provided by the Subcontract, before which Questar was prohibited from exercising its right to terminate, interpreting the Subcontract to allow Questar to terminate it for any reason whatsoever would mean that Questar had absolute control over whether it paid any compensation to CB Flooring. Thus, under Questar's interpretation, it simply could have terminated the Subcontract before CB Flooring began performing (as apparently it did). Were that the case, the Subcontract would be illusory under this Court's opinion in *Cheek v. United Healthcare of the Mid–Atlantic, Inc.,* 378 Md. 139, 835 A.2d 656 (2003).[23] There, we held that an arbitration clause authorizing one party to "alter, amend, modify, or revoke the [arbitration p]olicy at its sole and absolute discretion at any time with or without notice" rendered the agreement to arbitrate illusory. *Cheek,* 378 Md. at 142–43, 835 A.2d

---

23. *See also Torncello,* 681 F.2d at 769 ("It is hornbook law . . . that a route of complete escape vitiates any other consideration furnished and is incompatible with the existence of a contract.").

at 658. In other words, if we accepted and applied *Niagara Mohawk Power Corp.*, as Questar argues we should, the Subcontract would be illusory.[24] As explained earlier, such an interpretation of a contract is not the preferred one and, here, it would disregard the plain and unambiguous language of the Subcontract, which contemplated that the agreement would remain effective for the duration of completion of the Greenwich Place project.

■ Accordingly, we hold that termination for convenience rights, like that provided for in Paragraphs 12 and 14 of this Subcontract, may be enforceable, subject to the implied limitation that they be exercised in good faith and in accordance with fair dealing. Thus, we agree with the Circuit Court to the extent that it concluded that Questar's right to terminate the Subcontract for convenience was not unlimited. Although there are few reported opinions discussing what, if any, limitations there are on the exercise of a termination for convenience right by a private party, those recognize generally that the right must be exercised in good faith. *See, e.g., Harris Corp. v. Giesting & Assocs., Inc.*, 297 F.3d 1270, 1272–73 (11th Cir.2002) ("Termination for convenience clauses may not be used to shield the terminating party from liability for bad faith or fraud."); *EDO Corp. v. Beech Aircraft Corp.*, 911 F.2d 1447, 1453 n. 6 (10th Cir.1990) ("We concur in the district court's determination that Beech's exercise of its right to terminate [for convenience] must have been exercised in good faith.").

Furthermore, with specific regard to construction contracts, one commentator observed:

> Sometimes an owner is given the right in a contract to terminate for "convenience." In other words, *if it is economically unfeasible to continue the project, the owner may be allowed to terminate* and to compensate the general

---

**24.** Another key difference between this case and *Niagara Mohawk Power Corp.* is that the contract in the latter required 2 days notice to terminate. 470 F.Supp. at 1314. We decline to speculate whether a contract reserving the right to terminate for any reason, upon two days notice, would be enforceable under *Cheek.*

contractor (and its subcontractors) for work performed and any losses incurred up to the date of termination.... *Although "convenience" implies a very broad spectrum of circumstances, such a termination must be done in good faith,* or the owner may have broader liability than the contract provisions contemplate.

David A. Senter, *Role of the Subcontractor, in* FUNDAMENTALS OF CONSTRUCTION LAW 133 (italics added).

There undeniably is utility in including a broad termination right in contracts in the context of rapidly changing industries and in contracts for large, long-term build-out projects. Such a right to terminate for convenience may serve as an effective tool, protecting one party from the risk of loss in markets where there is a substantial risk due to changing technology or where loss, if it occurs, could result in a financial Waterloo, as in the construction industry. At the same time, the right to terminate for convenience, as we interpret it, provides adequate consideration for the other party to the contract, protecting that party's expectations in a binding enforceable agreement and prohibiting the terminating party from yanking out arbitrarily the carpet from underneath the agreement.

## II.

We now turn to whether the trial judge correctly found that Questar was not permitted to terminate the Subcontract for its convenience under the circumstances of this case. In reaching her conclusion, she rejected Questar's assertion that its subjective loss of faith in CB Flooring's ability to perform under the Subcontract provided sufficient justification for exercising its termination right. On appeal, Questar claims that the trial judge did not make a finding of bad faith, but, to the extent that she found facts that effectively are consistent with a finding of bad faith, those findings were clearly erroneous. We hold that the trial judge concluded properly that Questar's subjective belief (or "gut feeling") was sufficient to trigger application of the convenience termination clause; however, we agree with Questar that the trial judge did not

render an express or implied finding on the ultimate fact of whether the general contractor acted in bad faith by terminating the Subcontract, although she made several findings of fact that could be viewed as contributory to reaching such a finding. Accordingly, we shall remand the matter to the Circuit Court to reach a conclusion as to the ultimate issue of whether Questar breached the Subcontract by not exercising in good faith its discretion to terminate the Subcontract for convenience. In doing so, we supply the following guidance on how the implied obligation of good faith and fair dealing may apply in this case.[25]

 " '[U]nder the covenant of good faith and fair dealing, a party [exercising discretion must] refrain from doing anything that will have the effect of frustrating the right of the other party to receive the fruits of the contract between them.' " *Clancy*, 405 Md. at 571, 954 A.2d at 1109 (quoting *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 184 (4th Cir.2000)). This means that each party must "do nothing to destroy the rights of the other party to enjoy the fruits of the contract and [ ] do everything that the contract presupposes they will do to accomplish its purpose." *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 728 (7th Cir.1979). In addition, the obligation to act in good faith and deal fairly prohibits a party from terminating its contract (or otherwise exercising its discretion) to "recapture" an opportunity that it lost upon entering the contract. *Greer Props., Inc. v. LaSalle Nat'l Bank*, 874 F.2d 457, 461 (7th Cir.1989); *Piantes v. Pepperidge Farm, Inc.*, 875 F.Supp. 929, 938 (D.Mass.1995). Upon enter-

---

**25.** CB Flooring bears the initial burden of production to adduce a prima facie showing that Questar invoked the termination for convenience clause in bad faith, i.e., the absence of good faith. If it satisfies the trier of fact that this burden is met, the issue of "good faith" is in play and the burden of production shifts to Questar. Also, Questar, at this point has the burden of persuasion, on a preponderance of evidence standard, to prove the good faith exercise of its termination power. *David A. Bramble, Inc. v. Thomas*, 396 Md. 443, 467, 914 A.2d 136, 150 (2007); *Port East Transfer, Inc. v. Liberty Mut. Ins. Co.*, 330 Md. 376, 386–88, 624 A.2d 520, 524–25 (1993); 23 WILLISTON, CONTRACTS, § 63:22 (4th ed. 2007).

ing a binding contract for a specified duration, the parties thereto "give up their opportunity to shop around for a better price." *Greer Props., Inc.*, 874 F.2d at 461.

■ Where, as here, personal taste does not provide the basis for the exercise of discretion, an objective standard of what constitutes good faith and fair dealing applies. *See Clancy*, 405 Md. at 568–69, 954 A.2d at 1108 (noting difference between objective and subjective standards of good faith and applying subjective standard to author's decision on whether to withdraw his name from series of books published by partnership of which he was a partner). Stated otherwise, the obligation of good faith and fair dealing requires a party exercising discretion to do so in accordance with the "reasonable expectations" of the other party. BURTON & ANDERSON, CONTRACTUAL GOOD FAITH § 2.3.3. What constitutes a "reasonable expectation," of course, depends on the language of the contract. *Id.* § 3.3.4. We agree with Professors Burton and Anderson, who explain:

> This accommodation requires meaningful review because a discretion-exercising party may be called upon to justify its actions by giving its reasons. A court or jury must decide whether those reasons reasonably deserved significant weight and were among the reasons allowed by the contract. If they satisfy these criteria, then the discretion exercising party performed in good faith. At the same time, this standard requires deference to the discretion exercising party, not judge or jury. Accordingly, a reasonableness standard allows meaningful legal review of discretion without overreaching—a deferential standard that bites.

*Id.* § 3.3.4.

■ Here, the trial judge specifically found that Questar "schemed" to contract with CTI to install carpeting at Greenwich Place, after it contracted with CB Flooring. She based that finding on Maccherone's sending the ID Drawings to CTI's salesperson, despite having an agreement already with CB Flooring, as well as on the testimony of CTI's salesperson that she felt uncomfortable when Maccherone later asked her

to send him a fax stating that New Stratford and Bigelow carpets were of comparable price. The trial judge found that CB Flooring did nothing to jeopardize timely performance of the Subcontract. Moreover, she resolved that Questar never communicated to CB Flooring its belief (asserted at trial) that the subcontractor was taking too long to respond to the changes advanced by the ID Drawings or that it was in any other way dissatisfied with the subcontractor. She also found that CB Flooring was not using the change order as leverage against the general contractor. These findings are relevant to the bad faith inquiry; however, we think it appropriate to remand the matter to the Circuit Court because it is not clear on what guiding legal principles the trial judge relied when she concluded that the right to terminate for convenience did not apply under the circumstances. To that end, it is not patent that the trial judge actually found bad faith.

As already explained, the right to terminate a contract for convenience is a risk-allocating tool, which allowed Questar to terminate the Subcontract if, in its discretion, it determined that continuing with the Subcontract would subject it potentially to a meaningful financial loss or some other difficulty in completing the project successfully. On remand, the trial judge must be persuaded that Questar breached the Subcontract by exercising its right to terminate for convenience in bad faith, or, stated otherwise, by not exercising its discretion to terminate in accordance with the implied obligation of good faith and fair dealing. As the party with the discretion to terminate for convenience, Questar was entitled to decide whether continuing with the contract would subject it to an unnecessary risk. It is not the court's role to make that decision for Questar; the court's role is to determine only whether Questar's determination was consistent with the reasonable expectations of CB Flooring, in light of the terms of the Subcontract.

CB Flooring may prevail if the trial court is convinced that Questar's asserted basis for the termination—a deterioration in its business relationship with CB Flooring—was not commercially reasonable under the circumstances, and therefore

inconsistent with CB Flooring's reasonable expectations. Additionally, if the trial judge were to conclude that Questar sought to recapture a better bargain with CTI or that Questar did not make reasonable efforts to ensure that continuing its contractual relationship with CB Flooring remained convenient, CB Flooring may prevail. If the court resolves that Questar invoked its right to terminate for convenience in order to evade its obligation to perform under Paragraphs 13 or 16, as such an exercise would have been inconsistent with the subcontractor's reasonable expectations as well, CB Flooring may prevail.

Supplemental fact-finding may aid the Circuit Court in applying this Opinion on remand. Our review of the record revealed the following unresolved factual conflicts that potentially may be relevant to the ultimate conclusion whether Questar acted in bad faith.[26] First, the trial judge did not discuss what significance, if any, should be attributed CB Flooring's attempt, in submitting its change order to Questar, to withhold from Questar 10% of the costs associated with the Shaw carpeting. This may have played a role in Questar's decision to terminate the Subcontract. Second, while the trial judge stated that she believed the price of CTI's original bid to be approximately $1,240,000 ($120,000 above what it agreed to in its 5 April 2006 subcontract with Questar), Questar asserts that that bid price did not reflect accurately the closeness of CTI's bid to that of CB Flooring. To that end, Questar claims that CTI's initial bid included items not included in its subcontract. The Circuit Court, on remand, may assess the merit of Questar's assertion, as the record indicates that the trial judge considered the disparity between the initial bids of CTI and CB Flooring relevant to her decision. Were the court to undertake this inquiry, it should consider reconciling the items included in the bid with those included in the subcontract.

---

**26.** The factual discrepancies that we catalog here should not be regarded as an exclusive list. The trial court may resolve all or some these (as it sees fit) and any other disputed facts that it considers relevant in light of this Opinion.

Third, it also may be relevant whether Questar included, in its February 2006 draft subcontract with CTI, a provision allowing CTI to install Bigelow border carpeting at Greenwich Place. Maccherone claimed that it did not, that the provision was added later during negotiations with CTI, and that the document's February date was never changed. The trial judge's findings on this point are not clear on the current state of the record [27]; however, if it turns out that Questar planned to permit CTI to install Bigelow carpeting before it terminated the Subcontract, that may shed significant light on Questar's motives. Fourth, the Circuit Court may wish to consider the reasonableness of Questar's assertions that CB Flooring was delaying its ordering of materials. Were it to do so, the court may want to determine whether Questar requested CB Flooring to order materials and, if so, how CB Flooring responded to such a request.[28] Fifth, it may be relevant whether the length of time that passed before CB Flooring responded to either set of ID Drawings was commercially reasonable under the circumstances. Sixth, the Circuit Court also may wish to consider whether CB Flooring's error in not factoring border carpeting in its initial bid played a reasonable role in Questar's decision to terminate the Subcontract. It may be relevant whether CB Flooring attempted to shift the cost of its mistake to Questar. Finally, we note that Questar's subcontract with CTI was for the same price as the Subcontract at issue here. CB Flooring's allegation that Questar sought to obtain a better bargain from CTI may make this fact significant.

---

**27.** *See supra* note 11.

**28.** As stated, the trial judge found that CB Flooring did nothing to jeopardize timely performance of the Subcontract. While this finding is significant in assessing whether Questar acted in bad faith, we reiterate that the trial court's role in reviewing Questar's actions under the implied obligation of good faith and fair dealing is not to determine whether CB Flooring actually could or would have fulfilled its obligations, but whether Questar's determination that CB Flooring posed a risk of not fulfilling them was commercially reasonable under the circumstances.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO ABIDE THE RESULT.**