Allstate Lien and Recovery Corporation, et al. v. Cedric Stansbury, No. 7, Sept. Term, 2015 Opinion by Battaglia, J.

**COMMERCIAL LAW – MOTOR VEHICLE – CREATION OF GARAGEMAN'S LIEN**

The plain language of the statute that provides for the creation of a garageman's lien includes charges incurred for "repair or rebuilding, storage, or tires or other parts or accessories" but does not include charges for lien enforcement costs or expenses or cost of process fees when the owner redeems or attempts to redeem the vehicle prior to sale.

Circuit Court for Baltimore County,
Maryland
Case No. C-11-10572
Argued: September 10, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 7

September Term, 2015

ALLSTATE LIEN AND RECOVERY
CORPORATION, et al.

v.

CEDRIC STANSBURY

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Glenn T., Jr.
(Retired, Specially
 Assigned),

JJ.

Opinion by Battaglia, J.
Harrell, J., concurs

Filed: November 23, 2015

In the present case, Cedric Stansbury, Respondent, was informed by Allstate Lien, Jeremy Martin, and Russel Collision, Petitioners, that he would have to pay $1,000 representing "lien enforcement costs" or "cost of process" fees[1] in order to redeem his Mazda RX-8 prior to its sale.[2] It is undisputed that the $1,000 was not actually incurred by Russel Collision but, rather, was the amount agreed upon between Russel Collision and Allstate Lien to conduct the sale. Mr. Stansbury unquestionably received notice of the sale; it is not the efficacy of the sale that is before us. Rather, it is the fact that Russel Collision and Allstate Lien argue that they were entitled, without Mr. Stansbury's consent,[3] to keep his car and eventually sell it, unless Mr. Stansbury paid, in order to

---

[1] We understand that "lien enforcement costs" or "cost of process" are those amounts incurred or accrued by a garageman related to the sale at auction of a vehicle for which repair costs have not been paid. Lien enforcement costs are referenced in Sections 16-206, 16-207, and 16-208 of the Commercial Law Article of the Maryland Code (1975, 2005 Repl. Vol.). Section 16-206(b)(3)(iii) refers to "[a]ll cost and expenses which result from the enforcement of the lien and are incurred before the lienor was notified that the bond was filed." Section 16-207(e)(1)(i) speaks of "[t]he expenses of giving notice and holding the sale, including reasonable attorney's fees[.]" Section 16-208(b)(1)(ii) refers to "any expenses properly incurred or accrued before the trial, including storage and advertising." All references to Sections 16-201 *et seq.* of the Commercial Law Article of the Maryland Code (1975, 2005 Repl. Vol.) are to the provisions which were applicable at the time the complaint was filed.

[2] We granted certiorari in this case to consider the following question:

> Whether the Circuit Court for Baltimore County and the Court of Special Appeals misinterpreted COMMERCIAL LAW ARTICLE §§ 16-201 through 16-209 in their conclusion that a lien and recovery company hired to execute a garageman's lien cannot include its lien enforcement costs and expenses for executing the lien as part of the amount necessary to redeem the vehicle.

441 Md. 217, 107 A.3d 1141 (2015).

[3] The repair authorization letter presented to Mr. Stansbury by Russel Collision, which Mr. Stansbury signed, reflected the following:

(continued . . . )

( . . . continued)

RUSSEL AUTOMOTIVE COLLISION CENTER
6624 BALTIMORE NATIONAL PIKE
BALTIMORE, MD 21228
PHONE: (410) 818-2271  FAX: (410) 818-2019

DEAR CUSTOMER,

Thank you for choosing Russel Automotive Collision Center. We would like for you to take a moment to the [*sic*] read the following information concerning our policies.

1. We offer lifetime warranty on the repair work made to your vehicle. We offer a 1 yr warranty on all parts unless more or less based on manufacturer warranty. Should any problem occur from the repairs, we will take care of them at the owners convenience. Alternate transportation will be customer responsibility. We do offer shuttle service to your home or place of employment.

2. All payments must be made before picking up vehicle is released [sic]. We accept insurance checks, personal checks, credit cards, certified blank checks, cash, and money orders. We do not accept third party payments.

3. Russel Automotive Collision Center will not be responsible for personal items left in vehicle. Please remove all items such as baby seats, gps systems, cd's or any other personal belongings you may have.

4. We will do our best to estimate length of time for repair. However we can not promise a due date or guarantee one due to unknown delays with repairs or insurance companies.

5. We will negotiate all supplement amounts with the insurance companies. We can not be responsible for insurance company delays. When vehicle is complete we will contact you immediately. Feel free to call anytime to check the status of your vehicle.

We will do our very best to work with you and your insurance company to return your vehicle to pre accident condition.

Thank you,

Russel Automotive Collision Center

I AUTHORIZE RUSSEL AUTOMOTIVE COLLISION CENTER TO REPAIR MY VEHICLE AND ORDER ANY NECESSARY PARTS NEEDED FOR REPAIR.

Mr. Stansbury signed the repair authorization agreement on April 7, 2011.

redeem his vehicle, the costs related to the sale of the car that was scheduled to occur in the future, in addition to the repair costs associated with the Mazda RX-8.

In the present case, Mr. Stansbury filed suit in the Circuit Court for Baltimore County in June of 2011 alleging violations of the Maryland Consumer Protection Act,[4]

---

[4] The Maryland Consumer Protection Act, in effect at the time these proceedings were instituted, was codified at Title 13, Subtitle 3 of the Commercial Law Article (1975, 2005 Repl. Vol.). Section 13-301 of the Act provided, in pertinent part:

Unfair or deceptive trade practices include any:

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

(2) Representation that:

(i) Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;

* * *

(3) Failure to state a material fact if the failure deceives or tends to deceive;

* * *

(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:

(i) The promotion or sale of any consumer goods, consumer realty, or consumer service;

* * *

(14) Violation of a provision of:

* * *

(iii) Title 14, Subtitle 2 of this article, the Maryland Consumer Debt Collection Act.

3

the Automotive Repair Facilities Act,[5] and the Consumer Debt Collection Statute,[6]

---

[5] The Automotive Repair Facilities Act, in effect at the time these proceedings were instituted, was codified at Title 14, Subtitle 10 of the Commercial Law Article (1975, 2005 Repl. Vol.). Section 14-1008(a) of the Act provided that:

> (a) *Customer given copy*. – Except as provided in subsection (c) of this section, before beginning any repair work on a motor vehicle, an automotive repair facility shall give the customer a copy of a form used for authorization of repairs which shall inform the customer of the following rights:
>> (1) That a customer:
>>> (i) May request a written estimate for repairs which cost in excess of $50; and
>>> (ii) May not be charged for any amount ten percent in excess
>> of the written estimate without the customer's consent;
>> (2) That the customer is entitled to the return of any replaced parts except when parts are required to be returned to the manufacturer under a warranty agreement; and
>> (3) That repairs not originally authorized by the customer may not be charged to the customer without the customer's consent.
> (b) *Customer's rights*. – The customer's rights provided in subsection (a) of this section shall be:
>> (1) Displayed immediately before the space for the signature of the customer conspicuously in easily readable type;
>> (2) Physically separated from the other terms of the form used for authorization of repairs; and
>> (3) Listed under the printed heading "Customers' Rights".

The Automotive Repair Facilities Act claim was later dismissed.

[6] The Consumer Debt Collection Statute, in effect at the time these proceedings began, was codified at Title 14, Subtitle 2 of the Commercial Law Article (1975, 2005 Repl. Vol.). Section 14-202 of the Act provided, in relevant part, that:

> In collecting or attempting to collect an alleged debt a collector may not:
>
> * * *
>
> (8) Claim, attempt, or threaten to enforce a right with knowledge that the right does not exist[.]

as well as one count of unjust enrichment[7], another count of malfeasance,[8] and another count of breach of the implied duty of good faith and fair dealing[9], as a result of Russel Collision having placed a lien on his 2009 Mazda RX-8 and the subsequent sale of the vehicle. Initially, Mr. Stansbury sued Russel Collision Center, Inc., located in Baltimore County, Maryland, Jeremy Martin, the manager of Russel Collision, and Allstate Lien and Recovery Corporation, of Baltimore, Maryland, as well as Owings Mills Motor Cars, Inc., Paul Martin, the alleged buyer of the vehicle who was employed by Owings Mills

---

[7] In order to prove a claim of unjust enrichment, a party must establish:
> 1. A benefit conferred upon the defendant by the plaintiff;
> 2. An appreciation or knowledge by the defendant of the benefit; and
> 3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.

*Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295, 936 A.2d 343, 351 (2007), quoting *Berry & Gould, P.A. v. Berry*, 360 Md. 142, 151-52, 757 A.2d 108, 113 (2000).

[8] Black's Law Dictionary defines malfeasance as, "A wrongful, unlawful, or dishonest act; especially, wrongdoing or misconduct by a public official." Black's Law Dictionary 1100 (10th ed. 2014). The claim of malfeasance was later dismissed.

[9] In *Questar Builders, Inc. v. CB Flooring, LLC*, we stated, in dicta, that:
> Maryland contract law generally implies an obligation to act in good faith and deal fairly with the other party or parties to a contract. That implied obligation governs the manner in which a party may exercise the discretion accorded to it by the terms of the agreement. Thus, a party with discretion is limited to exercising that discretion in good faith and in accordance with fair dealing.

410 Md. 241, 273, 978 A.2d 651, 670 (2009) (internal citations omitted). The count alleging breach of the implied duty of good faith and fair dealing was not included in any subsequent complaint filed by Mr. Stansbury.

Motor Cars, Inc., and Josephine Keehner, the office manager of Allstate Lien, who notarized various documents.[10] After filing an Amended Complaint as well as a Second Amended Complaint, Mr. Stansbury finally settled upon a Third Amended Complaint, in which he alleged that he, in 2010, had his Mazda RX-8 serviced at Russel Collision but later experienced an engine seizure that led to his car being struck by another vehicle:

> 13. In late November 2008, Plaintiff purchased the new Mazda RX-8 for $31,648, not including title, tax, and fees. He paid cash for his vehicle.
> 14. In late 2010, Plaintiff got an oil change from Defendant Russel. Shortly after that, on or about December 2010, Plaintiff's engine seized, most likely from Defendant Russel's failure to properly change the oil. When the engine seized the vehicle stopped in the middle of the road. As Plaintiff went to get help, an unidentified driver struck the Mazda RX-8, causing body damage.

Mr. Stansbury further averred that four months into the repair, he was asked to sign, on April 7, 2011, a document which evaluated the work to be done:

> 15. The vehicle was towed to Defendant Russel's shop where the engine was replaced. This was paid for under Plaintiff's warranty.
> 16. Plaintiff had repeated direct dealings with Defendant Jeremy Martin regarding the repairs and later lien on the subject vehicle.
> 17. Plaintiff's insurer, the Maryland Automobile Insurance Fund ("MAIF" or "the insurer"), evaluated the body damage. Defendants Jeremy Martin and Russel knew that the vehicle was insured and dealt directly with representatives from MAIF regarding the work that needed to be done and the amount MAIF would pay.
> 18. Although the vehicle was taken to Russel in December 2010, representatives from Russel did not begin working on the vehicle for approximately four (4) months, telling Plaintiff that, due to the earthquake in Japan, the parts for the body work were not available.
> 19. On April 7, 2011, Defendant Russel asked that Plaintiff sign a document concerning its repair policies (*see* "Dear Customer" letter, Exhibit 1). Prior to that time no documents were signed by Plaintiff

---

[10] Owings Mills Motor, Inc. Paul Martin and Josephine Keehner were later dismissed as parties.

regarding approval for repairs, and no repair invoices were ever signed by Plaintiff.

20. On or about May 7, 2011, Defendant Russel and/or MAIF supplemented its evaluation of the work needed to be done to the Mazda and the total repair amount came to $7,134.83. According to Defendant Russel's handwritten notes, the insurer paid Russel $804.46 directly, bringing the amount owed to $6,330.37 (apparently comprising the insurance amount of $6,080.37 and a $250 deductible).

According to the complaint, Mr. Stansbury was notified that his vehicle was finished on May 17, 2011; he was presented a bill in the amount of $6,330.37 for the repairs:

21. According to the Defendant Russel's handwritten notes submitted to the MVA [Motor Vehicle Administration], the first time Russel notified the Plaintiff that his vehicle was done and that he owed $6,330.37 was on May 17, 2011 (*see* Defendant Russel's notes, Exhibit 2).

Over the next month, according to the complaint, Mr. Stansbury attempted to retrieve his Mazda RX-8 but the amount charged by Russel Collision to redeem the car changed from $6,330.37 to $6,630.37 and then to $7,630.37:

22. Plaintiff made several attempts to make arrangements to pay for the repairs and discussed with Defendant Jeremy Martin shortly after May 17, 2011, that he could have payment by mid-June. Since Russel had held the car for over four (4) months, Plaintiff reasonably believed that it would not be a problem if he paid for the car in mid-June, and Defendant Jeremy Martin gave no indication that this would be a problem.
23. During this time, however, the price demanded to retrieve the car kept changing, rising from $6,330.37 to $6,630.37 to $7,630.37.

The complaint also alleged that a Notice of Sale at auction on June 23, 2011 of the Mazda RX-8, resulting from the enforcement of a lien, listed the repair charges as $6,630.37 plus cost of process fees of $1,000, for a total of $7,630.37:

24. Sometime in early June 2011, Defendant Jeremy Martin, as manager of Defendant Russel and Owen Douglas Cooper and as auctioneer

7

for Defendant Allstate, signed a "Notice of Sale of Motor Vehicle to Satisfy a Lien" for the Mazda RX and listed the 'process start date' as June 2, 2011. According to the notice, the 'repair order charges' were $6,630.37, $300 more than the amount quoted to Plaintiff (*see* Notice of Sale, Exhibit 3).[11]

25. In addition, this document dated June 2, 2011 listed 'cost of process' at $1,000, although no explanation was given as to this amount. The total now demanded for return of the subject vehicle was $7,630.37, $1,300 more than the quote given to Plaintiff less than two weeks before (*see* Notice of Sale, Exhibit 3).

26. The Notice of Sale stated that the subject vehicle would be auctioned on June 23 (*see* Notice of Sale, Exhibit 3).

27. Although Defendants Russel and Allstate had Plaintiff's correct address (it is listed on the MAIF repair documents), this Notice, dated June 2, was sent to his old address and Plaintiff did not receive it until mid-June.

According to Mr. Stansbury's complaint, although he attempted to redeem his vehicle before the sale, he was rebuffed, and the Mazda RX-8 was sold at auction:

28. After receipt of the Notice of Sale, Plaintiff immediately called Defendant Allstate and asked why it was demanding so much more money. Defendant Allstate's employee, Defendant Josephine Keehner, would not give Plaintiff any information about this.

29. Plaintiff then called Defendant Jeremy Martin at Russel and asked him why he put a lien on the car when they had an agreement that payment would be made the second week in June and he had the money. Defendant Jeremy Martin would not provide any explanation and falsely told Plaintiff that the situation was out of his hands and he must deal directly with the lien company, Defendant Allstate.

30. Plaintiff then scrambled to get the additional $1,000 and contacted Defendant Allstate to inform them that he had the money but was told, falsely, that the car was "no longer his car."

---

[11] The Notice of Sale was introduced in evidence at trial and contained the following:
**WE HEREBY DEMAND FULL PAYMENT**

YOUR REPAIR ORDER CHARGES:………………..$ 6630.37
COSTS OF SAID PROCESS:…………………………$ 1000.00
TOTAL LIEN TO BE PAID:…………………………$ 7630.37

31. Despite this, Plaintiff called Defendant Allstate the day before the sale to repeat that he had the money. The car was auctioned on June 23, 2011 anyway.

After discovery ensued and preliminary motions occurred, the case proceeded to a three-day trial before a jury in June of 2013. At the close of all of the evidence, all of the parties moved for judgment, with Mr. Stansbury essentially arguing that Section 16-202(c) of the Commercial Law Article of the Maryland Code, which provided Russel Collision a lien for the Mazda RX-8, only permitted recovery of charges for "repair or rebuilding, storage or tires or other parts or accessories", not lien recovery costs of $1,000, when he attempted to redeem the Mazda RX-8 prior to sale. Allstate Lien, Jeremy Martin and Russel Collision, conversely, argued that the entire statutory scheme entitled them to collect the $1,000 as fees prior to the sale of the car and that they, therefore, violated neither the Debt Collection Act nor the Consumer Protection Act.

Judge Judith C. Ensor, the presiding judge, concluded that Section 16-202(c) was to be "strictly construed", such that the cost of process fees could not have been assessed as part of the lien for redemption prior to sale of the vehicle. Judge Ensor explained, "I also believe that the law essentially says the Legislature is presumed to know what it's doing and to do what it wants to do. There's absolutely nothing that would have prevented the Legislature from putting into Section 202(c) any anticipated fees." She

instructed the jury that the $1,000 "cost of process" fee was not an appropriate part of the

lien.[12]

A special verdict sheet was submitted to the jury, which contained the following:

1. Do you find by a preponderance of the evidence that Russel Auto Imports, LLC and/or Jeremy Martin violated the Maryland Consumer Protection Act?

2. Do you find by a preponderance of the evidence that Russel Auto Imports, LLC and/or Jeremy Martin violated the Maryland Consumer Debt Collection Act?

3. Do you find by a preponderance of the evidence that Allstate Lien and Recovery Corp. violated the Maryland Consumer Protection Act?

4. Do you find by a preponderance of the evidence that Allstate Lien and Recovery Corp. violated the Maryland Consumer Debt Collection Act?

If your answer is yes to either Question #1, #2, #3, or #4, go on to answer Question #5. If your answer to Questions #1, #2, #3, and #4 is no, your deliberations are complete. Sign the verdict sheet and notify the Court that you have concluded your deliberations.

5. What damages, if any, do you award to the Plaintiff, Cedric Stansbury?
   Economic: _____
   Emotional without physical manifestations: _____
   Emotional with physical manifestations: _____
   Other non-economic damages: _____
   TOTAL: _____

_____

[12] Judge Ensor instructed the jury, in relevant part: "I want to tell you that I did make a decision as a matter of law, and that is I have determined that the $1,000 processing fee is not an appropriate part of the lien, that should have been an upfront cost, you know, added to the lien in advance." The instruction pertaining to Section 16-202(c) that was provided to the jury stated:

Any person who, with the consent of the owner, has custody of a motor vehicle and who, at the request of the owner, provides a service to or materials for the motor vehicle, has a lien on the motor vehicle for any charge incurred for any:
(i) Repair or rebuilding;
(ii) Storage; or
(iii) Tires or other parts or accessories.
The lien is created when any of these charges are incurred.

The jury returned the attendant sheet upon which it awarded Mr. Stansbury $16,500 in economic damages, after answering "yes" to all of the questions, with also a handwritten notation that attorney's fees should be awarded to Mr. Stansbury.

Allstate Lien, Jeremy Martin, and Russel Collision appealed, and in a reported opinion, the Court of Special Appeals affirmed.[13] *Allstate Lien & Recovery Corp., et al. v. Stansbury*, 219 Md. App. 575, 101 A.3d 520 (2014). Utilizing a plain meaning approach to interpret Section 16-202(c), Judge Kathryn Graeff, writing on behalf of our intermediate appellate court, held that:

> Based on our review of Title 16 of the Commercial Law Article, and the plain language of CL § 16-202(c), we hold that a motor vehicle lien is based solely on charges incurred for repair or rebuilding, storage, or tires or other parts or accessories. The lien does not encompass 'cost of process' fees, and such fees should not be included in the amount the customer must pay to redeem the vehicle.

*Id.* at 589-90, 101 A.3d at 529. With respect to the second question, which is not before us, the Court of Special Appeals reasoned that, "the jury could properly find that appellants violated the MCDCA [Maryland Consumer Debt Collection Act] by including those costs in the amount of the lien that Mr. Stansbury was required to pay to redeem the vehicle." *Id*. at 591, 101 A.3d at 530.

---

[13] Before the Court of Special Appeals, Allstate Lien, Jeremy Martin, Russel Collision presented the following questions:
> 1. Did the circuit court err in finding that a processing fee is not part of a garageman's lien and cannot be included in the amount necessary to redeem the vehicle?
> 2. Does including the processing fee in the amount needed to redeem a vehicle violate the Maryland Debt Collection Act's prohibition against enforcing a "right" that does not exist?

We have had occasion to address the nature of a garageman's lien in *Friendly Finance Corporation v. Orbit Chrysler Plymouth Dodge Truck, Inc.*, 378 Md. 337, 835 A.2d 1197 (2003). Although the facts which gave rise to the present case involve a dispute regarding redemption of the car, rather than its sale, which was challenged in *Friendly Finance*, a review of the statutory scheme as described in that case is, nonetheless, helpful to understand the establishment and enforcement of a garageman's lien.[14] In *Friendly Finance*, Judge Glenn Harrell, writing for the Court, succinctly explained:

> The Maryland General Assembly, when it enacted the provisions relating to garageman's liens, envisioned that the statute would operate according to the following sequence of events:
>
> (1) The owner in possession of the motor vehicle takes it (or has it towed) to the garage and requests that it be repaired. § 16-202(c)(1).[15]
> (2) The garage performs the requested repairs, creating a lien in favor of [the] garage for the repair bill, and bills the owner. § 16-202(c)(2)(i).[16]

---

[14] Of all the provisions of the statutory scheme discussed in *Friendly Finance*, only Sections 16-202(c) and 16-207 of the Commercial Law Article of the Maryland Code are pertinent to the present case.

[15] Section 16-202(c)(1) of the Commercial Law Article of the Maryland Code (1975, 2005 Repl. Vol.) provided:
> (c) *Motor vehicle lien* – (1) Any person who, with the consent of the owner, has custody of a motor vehicle and who, at the request of the owner, provides a service to or materials for the motor vehicle, has a lien on the motor vehicle for any charge incurred for any:
> > (i) Repair or rebuilding;
> > (ii) Storage; or
> > (iii) Tires or other parts or accessories.

[16] Section 16-202(c)(2) of the Commercial Law Article of the Maryland Code (1975, 2005 Repl. Vol.) provided:

(continued . . . )

(3) The owner fails to pay the bill.

(4) The garage stores the vehicle, creating a lien in favor of the garage for storage costs. § 16-202(c)(1)(ii).

(5) The garage retains possession of the vehicle until either the charges are paid or the lien is otherwise discharged. § 16-203(a).[17]

(6) The garage, within 30 days of the creation of the lien, sends notice of the lien to all holders of perfected security interests. § 16-203(b)(1)(i).[18]

(7) If the bill remains unpaid for 30 days, the garage, at its option, may initiate a public sale of the vehicle. § 16-207(a).[19]

---

( . . . continued)

* * *

(2) A lien is created under this subsection when any charges set out under paragraph (1) of this subsection giving rise to the lien are incurred.

[17] Section 16-203(a) of the Commercial Law Article of the Maryland Code (1975, 2005 Repl. Vol.) provided: "(a) *Retention of possession*. — The lienor may retain possession of the property subject to the lien until: (1) The charges which give rise to the lien are paid; or (2) The lien is otherwise discharged in accordance with this subtitle."

[18] Section 16-203(b)(1)(i) of the Commercial Law Article of the Maryland Code (1975, 2005 Repl. Vol.) provided:

(b) *Notice of lien*. — (1)(i) Except as provided in subparagraph (ii) of this paragraph, within 30 days after the creation of the lien under this subtitle, including a lien created under § 16-207(c) of this subtitle, the lienor shall send notice of the lien by registered or certified mail to all holders of perfected security interests in the property who: 1. Are known to the lienor; or 2. Can be identified through a search of the public records where filings are made to perfect security interests in the property.

[19] Section 16-207(a) of the Commercial Law Article of the Maryland Code (1975, 2005 Repl. Vol.) provided:

(a) *Sale of property*. — If the charges which give rise to a lien are due and unpaid for 30 days and the lienor is in possession of the property subject to the lien, the lienor may sell the property to which the lien attaches at public sale. The sale shall be in a location convenient and accessible to the public and shall be held between the hours of 10 a.m. and 6 p.m.

(8) The garage sends notice, at least 10 days prior to sale, to the owner, all holders of perfected security interests, and the Motor Vehicle Administration. § 16-207(b)(2).[20]

(9) The garage publishes notice once a week for the two weeks immediately preceding the sale in one or more newspapers of general circulation in the county where the sale is to be held. § 16-207(b)(1).[21]

(10) The garage sells the vehicle. § 16-207.

(11) Proceeds of sale are applied as follows: § 16-207(e)(1)(i).[22]

    i. Expenses of the sale. § 16-207(e)(1)(ii).

    ii. Third-party storage fees. § 16-207(e)(1)(ii).

---

[20] Section 16-207(b)(2) of the Commercial Law Article of the Maryland Code (1975, 2005 Repl. Vol.) provided:

(b) *Notice of sale.* —

* * *

(2) In addition, the lienor shall send the notice by registered or certified mail at least 10 days before the sale to: (i) The owner of the property, all holders of perfected security interests in the property and, in the case of a sale of a motor vehicle or mobile home, the Motor Vehicle Administration.

[21] Section 16-207(b)(1) of the Commercial Law Article of the Maryland Code (1975, 2005 Repl. Vol.) provided:

(b) *Notice of sale.* — (1) The lienor shall publish notice of the time, place, and terms of the sale and a full description of the property to be sold once a week for the two weeks immediately preceding the sale in one or more newspapers of general circulation in the county where the sale is to be held.

[22] Section 16-207(e)(1) of the Commercial Law Article of the Maryland Code (1975, 2005 Repl. Vol.) provided:

(e) *Application of proceeds generally.* — (1) If notice required under §16-203 (b) of this subtitle was sent, the proceeds of a sale under this section shall be applied, in the following order, to:
(i) The expenses of giving notice and holding the sale, including reasonable attorney's fees;
(ii) Subject to subsection (f) of this section, storage fees of the third party holder;
(iii) The amount of the lien claimed exclusive of any storage fees except as provided in subsection (f) (2) of this section;
(iv) A purchase money security interest; and
(v) Any remaining secured parties of record who shall divide the remaining balance equally if there are insufficient funds to complete satisfy their respective interests, but not to exceed the amount of a security interest.

        iii. The lien claim for garage repair and storage bills. § 16-207(e)(1)(iii).

        iv. Any purchase money security interest. § 16-107(e)(1)(iv).

        v. Any remaining secured parties of record. § 16-207(e)(1)(v).

        vi. Any remaining balance to the owner. § 16-207(e)(4).[23]

*Friendly Finance*, 378 Md. at 345-47, 835 A.2d at 1202-03 (internal footnotes omitted).

In the present case, steps eight through ten provide the immediate context for Mr. Stansbury's attempts to redeem his Mazda RX-8.

   The lien in question in the present case has been commonly referred to as a garageman's lien, which is "an ex parte, prejudgment creditor's remedy." George W. Chesrow, *Garageman's Lien: Application of Procedural Due Process Safeguards*, 28 U. Miami L. R. 458, 459 (1974). As early as 1849, we had occasion to discuss liens upon personal property at common law, and opined, in dicta, "The doctrine of lien is more favored now than formerly; and it is now recognized as a general principle, that wherever the party has, by his labor or skill, improved the value of property placed in his possession, he has a lien upon it until paid." *Wilson v. Guyton*, 8 Gill 213, 214-15 (Md. 1849). We recognized the efficacy of a garageman's lien for repairs in *Winton Co. v. Meister*, 133 Md. 318, 320, 105 A. 301, 302 (1918), when we validated such a lien and stated, "While there is no statute in this state creating a repairman's lien for repairs to an

---

[23] Section 16-207(e)(4) of the Commercial Law Article of the Maryland Code (1975, 2005 Repl. Vol.) provided: "After application of the proceeds in accordance with paragraph (1) or (2) of this subsection, any remaining balance shall be paid to the owner of the property.

automobile, it is clear that a common-law lien would exist on such property until the charges for the labor and expenses are paid."

The first garageman's lien statute was enacted in 1918 and provided that:

> Whenever a motor vehicle or any part thereof is left by the owner thereof or by any person with his authority, express or legally implied, in the custody of any corporation, firm or individual for storage, or for the purpose of having furnished for or on account of the same any accessories, or tires, the corporation, firm or individual in whose custody said automobile or part thereof is left for all or any of the purposes aforesaid, shall have a lien on said motor vehicle or part thereof for all charges so incurred, and may lawfully retain the same until said charges have been paid, or until said lien is extinguished or discharged as hereinafter provided. Said lien shall be superior to the rights of the holders of conditional sale contracts, bills of sale, chattel mortgages or other liens or claims of any kind which are not executed and recorded as required by law, but shall be subordinate to the rights of holders of such conditional sale contracts, bills of sale, chattel mortgages or liens or claims where the same have been executed and recorded as required by law. Surrender or delivery of any motor vehicle subject to the lien aforesaid shall operate as a waiver or extinguishment of the same as against third persons without notice thereof, but shall not operate as such waiver or extinguishment as against the owner, or as against third persons with notice.
> In the case of a dispute as to the amount of the charge of such garage keeper or other custodian as aforesaid, such dispute shall be determined by appropriate legal proceedings, and the lien of such custodian shall continue until the final determination of such action, whereupon execution may issue and the property be sold under the same.
> The remedies for enforcing the aforesaid lien herein provided shall not be taken to preclude any other remedies allowed by law for the enforcement of a lien against personal property, nor bar the right to recover so much of the custodian's claim as shall not be paid by the proceeds of the sale of the property.

1918 Maryland Laws, Chapter 403. In 1924, the garageman's lien statute was re-enacted to include the costs for repair and rebuilding of a vehicle, in addition to storage, tires, or accessories:

Whenever a motor vehicle or any part thereof is left by the owner or by any other person with his authority, express or implied, in the custody of any corporation, firm or individual, association, or person for repair, rebuilding, storage, or for the purpose of having furnished for or on account of the same any parts, accessories, or tires, the corporation, firm, individual, association or person in whose custody said motor vehicle or part thereof is left for all or any of the purposes aforesaid, shall have a lien on said motor vehicle or part thereof for all charges so incurred, and may lawfully retain the same until said charges have been paid, or until said lien is extinguished or discharged as hereinafter provided. Said lien shall be superior to the rights of the holders of conditional sale contracts, bills of sale, chattel mortgages or other liens or claims of any kind which are not theretofore executed and recorded or filed for record as required by law, but shall be subordinate thereto where the same have been theretofore executed and recorded as required by law. Surrender or delivery of any motor vehicle subject to the lien aforesaid shall operate as a waiver or extinguishment, of the same as against third persons without notice thereof, but shall not operate as such waiver or extinguishment as against the owner or as against third persons with notice.

1924 Maryland Laws, Chapter 417.

The statute was codified in 1924 as Section 54 of Article 63, Maryland Code (1924), renumbered in 1939 as Section 41 of Article 63 (1939), before it was re-codified in 1975 as Section 16-202(c) of the Commercial Law Article (1975, 2005 Repl. Vol.), which, at the time of the events in issue in the present case as well as now states:

(c) *Motor vehicle lien* – (1) Any person who, with the consent of the owner, has custody of a motor vehicle and who, at the request of the owner, provides a service to or materials for the motor vehicle, has a lien on the motor vehicle for any charge incurred for any:
(i) Repair or rebuilding;
(ii) Storage; or
(iii) Tires or other parts or accessories.
(2) A lien is created under this subsection when any charges set out under paragraph (1) of this subsection giving rise to the lien are incurred.

17

Mr. Stansbury, as well as each of the Petitioners agrees, that, by its express language, Section 16-202(c) only provides for costs for repairs, rebuilding, storage, and tires or accessories to be included in a garageman's lien. We concur, as did the Court of Special Appeals, when it stated that:

> The plain language of CL § 16-202 is clear and unambiguous. A person who provides a service to, or materials for, a vehicle has a "motor vehicle lien" only for those charges incurred for repair or rebuilding, storage, or tires or other parts or accessories. A processing fee is not included as a part of the lien.

*Allstate Lien & Recovery Corp.*, 219 Md. App. at 587, 101 A.3d at 527.

The Petitioners, however, argue that the statutory context requires that Mr. Stansbury have paid the fees and expenses of the sale before redeeming his vehicle prior to sale. They reference Sections 16-207 of the Commercial Law Article, which governs disbursement of funds after sale, as well as Sections 16-206 and 16-208 of the Commercial Law Article, which permit the owner of the car to challenge the garageman's right to enforce the lien in a replevin action or in an appropriate judicial action. Because Section 16-202(c) involves only the creation of a lien and not the subsequent activity for its discharge, they argue that the entire statutory scheme permitting assessment of the cost of process of lien enforcement costs must be considered.

The Petitioners urge that they could have recovered the cost of process fees that they already expended had they sold the car, pursuant to Section 16-207(e)(1)(i), which at the time of the events in issue and now states, in pertinent part:

> (e) *Application of proceeds generally*. — (1) If notice required under § 16-203(b) of this subtitle was sent, the proceeds of a sale under this section shall be applied, in the following order, to:

18

(i) The expenses of giving notice and holding the sale, including reasonable attorney's fees[.]

The Petitioners insist that the sale of the vehicle is not limited to the actual sale at auction but instead includes the advance notices and registered mailings that are required as part of the sale process. In this regard, the Petitioners argue that a car owner could escape payment of these expenses by paying the outstanding repair bill after the expenses have been incurred and accrued but before the auction is held. To avoid this illogical result, they argue, the statutory scheme must be interpreted in a way that protects the garageman and requires the car owner to pay any costs and expenses accrued leading up to the sale of the car.

The Petitioners also rely on Section 16-208, which provided and continues to provide a vehicle owner the opportunity to file a replevin action[24] to secure the return of his car from the retaining garageman, prior to sale. They argue that the terms of Section 16-208 provide for them to secure the amount of "any expenses properly incurred or accrued before the trial, including storage or advertising":

(a) *Issuance of writ.* — If the owner of property subject to a lien institutes an action of replevin and establishes a right to the issuance of a writ but for the defendant's alleged lien under this subtitle, the court shall issue the writ.
(b) *Trial of replevin action.* — (1) In the trial of the replevin action, the court shall determine:
(i) The amount of the lien, if any; and

---

[24] Black's Law Dictionary defines replevin as, "An action for the repossession of personal property wrongfully taken or detained by the defendant, whereby the plaintiff gives security for and holds the property until the court decides who owns it." Black's Law Dictionary 1491 (10th ed. 2014).

(ii) The amount of any expenses properly incurred or accrued before the trial, including storage and advertising.

(2) If judgment is for the defendant:

(i) It may include reasonable attorney's fees; and

(ii) It shall be either for the property replevied or for the amounts determined in accordance with paragraph (1) of this subsection.

(3) The defendant has the burden of proof to establish his lien claim to the same extent as if he were a plaintiff in an action to secure judgment on an open account.

Section 16-208, in fact, permitted the garageman in *Friendly Finance* to assert $675 in lien expenses, in addition to repair and storage charges, as part of the lien in that case. *Friendly Finance*, 378 Md. at 341, 835 A.2d at 1200. Petitioners urge that the same result inures in the present case because they could have recovered the amounts were Mr. Stansbury to have filed a replevin action.

They also contend that Mr. Stansbury could have filed suit and recovered immediate possession of his vehicle by posting a corporate bond, conditioned upon full payment of the final judgment of the claim, costs of bringing suit, as well as "all costs and expenses which result from the enforcement of the lien", pursuant to Section 16-206(a):

(a) *Institution of judicial proceedings.* — (1) If the owner of property subject to a lien disputes any part of the charge for which the lien is claimed, he may institute appropriate judicial proceedings.

(2) Institution of the proceedings stays execution under the lien until a final judicial determination of the dispute.

(b) *Immediate repossession of property; bond*. — (1) If the owner of property subject to a lien disputes any part of the charge for which the lien is claimed, he immediately may repossess his property by filing a corporate bond for double the amount of the charge claimed.

(2) The bond shall be filed with and is subject to the approval of the clerk of the court of the county where the services or materials for which the lien is claimed were provided.

(3) The bond shall be conditioned on:

20

> (i) Full payment of the final judgment of the claim, together with interest;
> (ii) All costs incident to the bringing of suit; and
> (iii) All cost and expenses which result from the enforcement of the lien and are incurred before the lienor was notified that the bond was filed.

Petitioners insist that Section 16-206 supports their argument that they are entitled to the amount of expenses incurred or accrued in the enforcement of a lien because had Mr. Stansbury filed an appropriate judicial action, he would have been required to post a corporate bond in the amount of "all cost and expenses which result from the enforcement of the lien", resulting in their recovery of the amount of expenses that they had incurred.

Essentially, they argue that because enforcement of the lien always includes "costs and expenses" which result from the enforcement of the lien, they are entitled to the costs and expenses incurred and accrued whether or not Mr. Stansbury initiated any judicial action. In fact, counsel for Allstate Lien, in response to questioning by the Court at oral argument, posited that almost any amount could have been assessed for lien enforcement costs upon Mr. Stansbury to redeem his car prior to its sale:

> **Counsel**: [Mr. Stansbury] had other ways he could have stopped this sale. He could have challenged the bill. He could have said, 'I did something wrong.' or 'They did something wrong.' or 'This fee is too much.' The Court would have had to determine whether it was appropriate or it wasn't appropriate.
> **Court**: So you're saying, absent a consumer doing that, it's totally up to the company that repaired the vehicle and the lien company that does the sale, that what it asserts as the fees for a consumer to get back his car, even though under the Lien Recovery Act, in that section (c), it's never enumerated. It could be $5,000? It could be $10,000?

21

**Counsel**: As the attorney's fees that is in the statute could be $5,000. It could be $10,000.

We disagree. Although Mr. Stansbury's constitutional rights of due process are not at issue before us, as they were before the federal court in *Hernandez v. European Auto Collision, Inc.*, 487 F.2d 378 (2nd Cir. 1973), the basic premise presented in our garageman's lien statutory scheme is that costs incurred by the repair company to sell the vehicle subject to a garageman's lien, can only be recovered from the proceeds of the actual sale of the vehicle, when actual expenses for lien enforcement costs were known and could be authenticated.

Costs accrued in the course of arranging an impending sale, however, can only be recovered by the garageman through judicial intervention, prior to sale, solicited by the owner, in a replevin action or in an appropriate judicial action by posting a corporate bond covering such costs. In either circumstance, the amount owed for enforcement costs incurred, not the subject of a lien established under Section 16-202(c), would be subject to judicial scrutiny for reasonableness, at the least.

To interpret the statute differently would permit the repair company to assert, prior to sale, any amount (imaginary or otherwise) for lien enforcement costs in order to redeem the vehicle, even though the owner never consented to their assessment nor were they provided for in Section 16-202(c). To adopt the stance presented by the Petitioners would inhibit redemption of the vehicle and extinguish the car owner's interest. The Maryland statutory scheme does not afford such an unbridled opportunity to garagemen, such as Russel Collision, to assess on an ex parte basis such costs allegedly accrued or to

be accrued to enforce the lien, absent judicial intervention or consent by the vehicle owner.

As a result, we hold that a garageman's lien includes charges incurred for "repair or rebuilding, storage, or tires or other parts or accessories", but does not encompass lien enforcement costs or expenses or cost of process fees prior to sale, should the owner attempt to redeem the vehicle before sale.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS.**

Circuit Court for Baltimore County, Maryland
Case No. C-11-10572
Argued: September 10, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 7

SEPTEMBER TERM, 2015

---

ALLSTATE LIEN AND RECOVERY
CORPORATION, et al.

v.

CEDRIC STANSBURY

---

Barbera, C.J.,
Battaglia,
Greene,
Adkins,
McDonald,
Watts,
Harrell, Glenn T., Jr. (Retired, Specially
                                Assigned),
                    JJ.

---

Concurring Opinion by Harrell, J.

---

Filed: November 23, 2015

I concur with the legal analysis of the statutory scheme and the judgment expressed in the Majority opinion. I write separately only to flesh-out the factual narrative, in the interests of posterity and fairness.

No party to this case covered itself in glory. The Majority opinion catalogs amply Petitioners' mis-steps because it focuses as a source for the majority of its factual recitation on Stansbury's allegations in his Third Amended Complaint, not on what was proved at trial in a case that went to the jury, and was not disposed of on preliminary motion. Moreover, although thereby including a number of immaterial "facts," the Majority opinion neglects to mention some of the less than praiseworthy conduct of Stansbury:

- Stansbury received on or about 25 January 2011 from his insurer MAIF (after application of a $250 deductible), $6,086.00 to pay for the repair of his vehicle; he did not deposit the check into his M&T checking account until sometime in April 2011.
- He allowed those funds to be drawn-down thereafter to pay discretionary family expenses, rather than holding the money to pay Russel Collision for the repairs.
- Consequently, when Stansbury offered the first time to pay Russel Collision $6,330.37 on 18 May 2011 (after 5:00 p.m.) by check (at a point in the business day when his bank was closed), he admitted that he knew that he did not have sufficient available funds in the account (short by $3,000) to cover the check he wrote (but which a Russel employee would not accept until the bank could verify that Stansbury's account was active).
- Stansbury's explanation for why he wrote and tendered a check in an account that he knew lacked sufficient funds at the time it was delivered was that he had $3,000-4,000 in cash at home in a safe that he intended to deposit imminently so the check would not "bounce" (the supposed $3,000-4,000 in cash in the safe was available also at the time the MAIF check proceeds were used to pay the discretionary family expenses).
- As to each of the times after 18 May 2011 that Stansbury claimed he was ready to pay ostensibly Russel Collision the original $6,330.37 repair bill, he admitted that he knew that he still had not placed additional funds in his

checking account to cover such a check and that the account continued to lack sufficient funds to cover a check in that amount.

- The subsequent "bump up" of the repair costs from $6,330.37 to $6,630.37 was not a mystery to Stansbury; he acknowledged at trial that he had been told by Russel Collision that the additional $300 was for "a little extra work on the metal molding."

Nonetheless, I agree with the Majority opinion's interpretation of the statutory scheme. Although the statutory scheme authorizes the recovery by the lienholder of the cost and expense of having to resort to an actual sale of such a vehicle, it fails to address a "hole in the donut" where incurred *or* projected sale costs and expenses are demanded by the lienholder in order for the vehicle to be redeemed prior to sale. I imagine, at least as to actual and reasonable costs paid or incurred pre-sale, it may have been a legislative oversight not to have provided for their recovery; however, as the Majority opinion concludes implicitly, it is entirely rational to refuse to authorize unreasonable, imaginary, or projected costs and expenses to be imposed as a condition of pre-sale redemption.[1] Perhaps the Legislature should re-examine the statutory scheme in light of the Court's decision in this case.

---

[1] Russel Collision paid (pre-sale) to Allstate Lien & Recovery a total of $522 ($400 processing fee, $40 for advertising the sale, and $82 for title service). Whether that payment was reasonable is irrelevant on the record of this case.

2